EMACK *v.* KANE *et al.*

(*Circuit Court, N. D. Illinois.* February 27, 1888.)

1. PATENTS FOR INVENTIONS—THREATENING PURCHASERS WITH SUITS FOR INFRINGEMENT—INJUNCTION.

A court of equity has jurisdiction to restrain an attempted intimidation by one issuing circulars threatening to bring suits for infringements against persons dealing in a competitor's patented article, the bill charging, and the proofs showing, that the charges of infringement were not made in good faith, but with malicious intent to injure complainant's business.

**2. SAME—EVIDENCE—VALIDITY OF PATENT—COLLATERAL ATTACK.**

In a suit to restrain one from issuing circulars threatening to bring suits for infringements against all customers dealing in a competitor's patented article, a court of equity will not pass upon the validity of the patent, but it may consider the state of the art in connection with the defendant's conduct, to ascertain his good faith in issuing the circulars.

In Equity. On bill for injunction.
*Matthews & Dicker*, for complainant.
*Banning & Banning*, for defendants.

BLODGETT, J. This is a bill in equity, in which the complainant seeks to restrain the defendant Kane from sending circulars injurious to the complainant's trade and business. Both complainant and defendants are manufacturers of what are known as "noiseless" or "muffled" slates for use of school children. The complainant is the owner of a patent issued to one Ebenezer Butler, February 15, 1870, in which the slate was muffled, or rendered noiseless, as it is said, by making a slot through the frame near the outer edge, into which was spirally wound a piece of listing, cloth, or other fibrous material, which would deaden or break the sound of the slate when it came in contact with the desk or any other hard substance; the listing operating to muffle the faces and the edges of the frame. Complainant is also the assignee of letters patent granted April 3, 1877, to Francis W. Mallett, for a noiseless or muffled slate; the muffling being obtained by encircling the outer edge of the frame of the slate with a strip of wood a little larger than the thickness of the frame, which strip of wood was covered with cloth, or other soft material, so as to muffle both the edges and the faces of the slate frame. The bill also alleges that the defendants are manufacturers of noiseless or muffled school slates,—having their place of business in the city of Chicago,—under a patent, as they claim, granted March 28, 1877, to Harry C. Goodrich, which was reissued September 26, 1882, with an additional claim. It also appears that this class of goods is sold extensively by both these manufacturers to jobbers, who supply the retail dealers, from whom the slates are purchased for school use; and that the competition between these manufacturers is active and vigorous; that both are seeking to control as much of the trade as possible, or all of it, if they can do so; and that since August 1, 1883, up to the filing of this bill, which was in March, 1884, the defendants have sent out to the trade,—that is, to the jobbers and persons engaged in this class of slates,—circulars threatening all who should buy from the complainant, or deal in his slates, with law-suits, upon the ground that the complainant's slate is an infringement of the Goodrich patent as reissued. I do not intend to quote all these circulars, but extracts from a few will illustrate the character of the attacks which the defendants have made upon the complainant's business. In a circular issued September 26, 1882, and sent generally to the trade, occurs the following language:

"WHAT DO WE PROPOSE TO DO WITH INFRINGERS? Nothing for the present, so far as prosecuting Emack is concerned, and for reasons that the

trade well understand. We could stop him, of course, but he would open out the next day in another loft or basement, and under another name, and put us to the expense of another suit, and so on indefinitely. *When we commence suit we want to be sure of damages.* The language of the original patent was somewhat ambiguous, and hence there was some excuse for those who sold it, believing that it was not an infringement. *There can be no mistake now.* The language of the claims could not be made plainer. Any dealer who now sells the Emack slate knows that he is selling an infringement of our patent, and we shall protect ourselves and our friends by holding all who are responsible for royalty and damages."

"To Our Friends: We will say that very few *jobbers* have handled the Emack slate. Failing to sell to the jobbing trade, he went to the leading retailers, and sold them all he could. They, of course, had heard nothing of our claims as to infringement, as we sell only to jobbers. We *now* know every man in the country who handles these slates, and shall notify them all promptly of the reissue of the patent. Then, if they continue to sell, we shall be forced to adopt legal measures."

In another circular occurs the following language:

"Slate Patents. We advise any who are tempted to buy the Emack slate to 'go slow.' Don't accept the statement that, because he uses a 'bar,' and we do not, that his slate is not an infringement. We have a straight, square, 'no nonsense' patent on a *cord muffler*. *He uses a cord muffler, and hence he infringes our patent.* If you doubt it, ask any patent lawyer, and also ask regarding the truthfulness of his statement, in a late circular, that, if he is infringing, 'the law compels us to close his factory.' Better pay something to *keep* out of trouble than to pay to *get* out, and fail, besides. Of course, we know of every shipment he makes, and the quantity. Shipping to his own address shows, of course, that he and those who may buy them are afraid of the consequences, but it will do no good; we shall know who *sells them,* and royalty will be demanded in good time, by the proper parties, of the proper parties, and in a legal way."

In a still later circular occurs the following paragraph:

"We have, jointly with the patentee, placed the matter in the hands of attorneys of this city and New York, who have for many years had an extensive and very successful practice in law, and especially in prosecuting infringement cases. We instruct them to give the entire trade fair warning, and make very favorable terms with any who have been deceived, and propose to stop selling the so-called 'E. I. Slate;' but parties who want a lawsuit can have it. And here again we announce our purpose *not to sue Emack,* and here again we state that *every man in the trade knows why.* No one of you would do it, and if in our place you would do just as we are doing. We expect to commence some suits in August and September, selecting parties whose sales we think have amounted to enough so that the royalty and damages will pay at least a part of our expenses. If others want their suits later this year, or next season, all they have to do is to sell infringing slates until their sales aggregate a sufficient sum to justify us, and we will try to accommodate them."

And in a still later circular, addressed to the jobbing trade, defendants wrote:

"And now once more we say *we shall not sue Emack.* If this be libel, we take the consequences; but we *do expect* and *fully intend to* bring suits against those who sell infringing slates. * * * The longer we wait, the more royalty and damages we will collect from those who continue to sell infringing slates."

Many more extracts might be made from these circulars, which appear in the proof, but this is enough to show the spirit in which the defendant attempted to intimidate the complainant's customers from dealing with him, or dealing in the slates manufactured by him; and the proof shows abundantly that much business has been diverted from the complainant by these threats and circulars; that the complainant's business has been seriously injured, and his profits very much abridged by the course pursued in sending out these circulars. The proof in this case also satisfies me that these threats made by defendants were not made in good faith. The proof shows that defendants brought three suits against Emack's customers, for alleged infringement of the Goodrich patent by selling the Emack slates; that Emack assumed the defense in these cases, and, after the proofs were taken, and the suits ripe for hearing, the defendants voluntarily dismissed them,—the dismissals being entered under such circumstances as to fully show that the defendants knew that they could not sustain the suits upon their merits; that said suits were brought in a mere spirit of bravado or intimidation, and not with a *bona fide* intent to submit the question of infringement to a judicial decision.

The defense interposed is—*First*, that these circulars were mere friendly notices to the trade of the claims made by defendants as to what was covered by the Goodrich patent; *second*, that a court of equity has no jurisdiction to entertain a bill of this character, and restrain a party from issuing circulars, even if they are injurious to the trade of another.

In support of this latter point defendants rely upon the opinion of Mr. Justice BRADLEY, in *Kidd* v. *Horry*, 28 Fed. Rep. 773, and *Wheel Co.* v. *Bemis*, 29 Fed. Rep. 95, decided by Judges COLT and CARPENTER in the district court of Massachusetts. *Kidd* v. *Horry* was an application for an injunction restraining the defendant from publishing certain circular letters alleged to be injurious to the patent-rights and business of the complainant, and from making and uttering libelous and slanderous statements, written or oral, of, or concerning the business of, complainant, or concerning the validity of their letters patent, or of their title thereto, pending the trial and adjudication of a suit which had been brought to restrain the infringement of said patents; and Mr. Justice BRADLEY in deciding the case said:

"The application seems to be altogether a novel one, and is urged principally upon a line of recent English authorities, such as *Dixon* v. *Holden*, L. R. 7 Eq. 488; *Food Co.* v. *Massam*, 14 Ch. Div. 763; *Thomas* v. *Williams*, Id. 864; and *Loag* v. *Bean*, 26 Ch. Div. 306. An examination of these and other cases relied on convinces us that they depend on certain acts of the parliament of Great Britain, and not on the general principles of equity jurisprudence. * * * But neither the statute law of this country, nor any well-considered judgment of a court, has introduced this new branch of equity into our jurisprudence. There may be a case or two looking that way, but none that we deem of sufficient authority to justify us in assuming the jurisdiction. * * * * We do not think that the existence of malice in publishing a libel, or uttering slanderous words, can make any difference in the jurisdiction of the court. Malice is charged in almost every case of libel; and no cases or

authority can be found, we think, independent of statute, in which the power to issue an injunction to restrain a libel or slanderous words has ever been maintained, whether malice was charged or not."

The principle of this case, concisely stated, is that a court of equity has no jurisdiction to restrain the publication of a libel or slander. But it seems to me the case now under consideration is fairly different and distinguishable from the cases relied upon by the defendants in what seems to me a material and vital feature. In *Kidd* v. *Horry* the owner of a patent sought the interference of a court of equity to restrain the defendants from publishing and putting in circulation statements challenging the validity of his patent, and of his title thereto, on the ground that such publications were libelous attacks upon his property. . Here the complainant seeks to restrain the defendants from making threats intended to intimidate the complainant's customers under the pretext that complainant's goods infringe a patent owned or controlled by defendants, and threats that if such customers deal in complainant's goods they will subject themselves to suit for such infringement; the bill charging, and the proof showing, that these charges of infringement are not made in good faith, but with a malicious intent to injure and destroy the complainant's business. While it may be that the owner of a patent cannot invoke the aid of a court of equity to prevent another person from publishing statements denying the validity of such patent by circulars to the trade, or otherwise, yet, if the owner of a patent, instead of resorting to the courts to obtain redress for alleged infringements of his patent, threatens all who deal in the goods of a competitor with suits for infringement, thereby intimidating such customers from dealing with such competitor, and destroying his competitor's business, it would seem to make a widely different case from *Kidd* v. *Horry*, and that such acts of intimidation should fall within the preventive reach of a court of equity. It may not be libelous for the owner of a patent to charge that an article made by another manufacturer infringes his patent; and notice of an alleged infringement may, if given in good faith, be a considerate and kind act on the part of the owner of the patent; but the *gravamen* of this case is the attempted intimidation by defendants of complainant's customers by threatening them with suits which defendants did not intend to prosecute; and this feature was not involved in *Kidd* v. *Horry*. I cannot believe that a man is remediless against persistent and continued attacks upon his business, and property rights in his business, such as have been perpetrated by these defendants against the complainant, as shown by the proofs in this case. It shocks my sense of justice to say that a court of equity cannot restrain systematic and methodical outrages like this, by one man upon another's property rights. If a court of equity cannot restrain an attack like this upon a man's business, then the party is certainly remediless, because an action at law in most cases would do no good, and ruin would be accomplished before an adjudication would be reached. True, it may be said that the injured party has a remedy at law, but that might imply a multiplicity of suits which equity often interposes to relieve from; but the still more cogent reason seems to be

that a court of equity can, by its writ of injunction, restrain a wrong-doer, and thus prevent injuries which could not be fully redressed by a verdict and judgment for damages at law. Redress for a mere personal slander or libel may perhaps properly be left to the courts of law, because no falsehood, however gross and malicious, can wholly destroy a man's reputation with those who know him; but statements and charges intended to frighten away a man's customers, and intimidate them from dealing with him, may wholly break up and ruin him financially, with no adequate remedy if a court of equity cannot afford protection by its restraining writ.

The effect of the circulars sent out by the defendant Kane certainly must have been to intimidate dealers from buying of the complainant, or dealing in slates of his manufacture, because of the alleged infringement of the Goodrich patent. No business man wants to incur the dangers of a lawsuit for the profits which he may make as a jobber in handling goods charged to be an infringement of another man's patent. The inclination of most business men is to avoid litigation, and to forego even certain profits, if threatened with a lawsuit which would be embarrassing and vexatious, and might mulct them in damages far beyond their profits; and hence such persons, although having full faith in a man's integrity, and in the merit of his goods, would naturally avoid dealing with him for fear of possibly becoming involved in the threatened litigation. The complainant, as I have already stated, was engaged in the manufacture of school slates under the Butler and Mallett patents; the Butler patent being much older than the Goodrich, and the Mallett patent being nearly contemporaneous in issue with the Goodrich patent, under which the defendant was manufacturing. But the proof in this case shows a still older patent, granted to one Munger, in 1860, for a muffled or noiseless slate, which most clearly so far anticipates the patents of both complainant and defendants, as to limit them, respectively, to their specific devices. But I do not think the fact that complainant was the owner of these patents or operating under them, material to the questions in this case. The defendants claim that complainant's slates infringe the Goodrich reissue patent, and threaten complainant's customers with suits if they deal in complainant's slates. The state of the art to which the Goodrich patent pertains may be examined for the purpose of aiding the court in passing upon the question of defendants' good faith in making such threats, and the state of the art is only material, as it seems to me, for this purpose. The court will not attempt, in a collateral proceeding like this, to pass upon the validity of the Goodrich patent, but will consider, in the light of the proof as to the state of the art, and the proof as to defendant's conduct, whether the defendant made these threats against complainant's customers because he in good faith believed that complainant's slates infringed his patent, and intended to prosecute for such infringement, or whether such threats were made solely to intimidate and frighten customers away from complainant, and with no intention of vindicating the validity of his patent by a suit or suits. Instead of going into the courts to test the validity of the Butler patent, or the right

of complainant to make the kind of slates he was putting upon the market, the defendant, in a bullying and menacing style, asserts to the trade by these circulars that complainant is infringing the Goodrich patent, and threatens all who deal in complainant's slates with lawsuits, and all the perils and vexations which attend upon a patent suit. The average business man undoubtedly dreads, and avoids, if he can, a lawsuit of any kind, but a suit for infringement of a patent is so far outside of the common man's experience that he is terrorized by even a threat of such a suit. There seems to me certainly good grounds for doubting the validity of the Goodrich patent in the light of the state of the art at the time he entered the field; and that any lawyer well versed in the law of patents would surely hesitate to advise that the complainant's slates infringed the Goodrich patent, either before or after the reissue; and the conduct of the defendant in dismissing his suits for such alleged infringement without trial, shows that he did not believe that such infringement could be established.

I am, therefore, of opinion that the complainant has made a case entitling him to the interposition of a court of equity to prevent the issue of circulars, or other written or oral assertions, that the slates made by the complainant are an infringement upon the defendant's patent; and a decree may accordingly be entered as prayed in the bill.