### WILLIS v. O'CONNELL.

(District Court, S. D. Alabama; S. D., at Mobile. April 24, 1916.)

No. 22.

1. INJUNCTION ⬅⟶98(2)—SUBJECTS OF PROTECTION—INJUNCTION AGAINST LIBEL.

Equity will not restrain by injunction the publication in the public press of a libel, even though its effect will be to injure complainant in reputation, property, or business.

[Ed. Note.—For other cases, see Injunction, Cent. Dig. § 170; Dec. Dig. ⬅⟶98(2).]

2. INJUNCTION ⬅⟶118(4)—SUBJECTS OF PROTECTION—INJUNCTION AGAINST LIBEL.

Allegations in a bill that libelous charges made by defendant in his newspaper against customers of complainant who have signed testimonials to the merit of the article he sells will prevent other customers from giving like testimonials, and thus injure complainant's business, and that a

judgment against defendant could not be collected, do not warrant the granting of an injunction by a court of equity.

[Ed. Note.—For other cases, see Injunction, Cent. Dig. §§ 236–238; Dec. Dig. ☞118(4).]

3. JURY ☞12(1), 21(1)—LIBEL AND SLANDER ☞68—FORM OF REMEDY—RIGHT TO JURY TRIAL.

Under the Constitution of the United States the only remedy of one injured by a libelous publication is by criminal prosecution or an action at law, in which the defendant is entitled to a trial by jury.

[Ed. Note.—For other cases, see Jury, Cent. Dig. §§ 27, 28, 34, 82, 99, 101, 103, 134, 136, 137, 141; Dec. Dig. ☞12(1), 21(1); Libel and Slander, Cent. Dig. §§ 169, 170; Dec. Dig. ☞68.]

4. EQUITY ☞46—JURISDICTION—ADEQUATE REMEDY AT LAW—"IRREPARABLE INJURY."

The mere fact that a defendant cannot be compelled to pay a judgment at law cannot make the plaintiff's remedy there inadequate, or his injury irreparable, in such sense as to give a federal court of equity jurisdiction.

[Ed. Note.—For other cases, see Equity, Cent. Dig. §§ 151, 152, 157, 159–163; Dec. Dig. ☞46.

For other definitions, see Words and Phrases, First and Second Series, Irreparable Injury.]

5. LIBEL AND SLANDER ☞48(1)—PRIVILEGE—COMMENTS ON PROPRIETARY MEDICINES.

It is within the rights of the publisher of a newspaper to question the efficacy of a proprietary medicine offered to the public, and to advise the public against it, within the limits of the law, which prescribes penalties, civil and criminal, for libelous publications.

[Ed. Note.—For other cases, see Libel and Slander, Cent. Dig. §§ 144, 147; Dec. Dig. ☞48(1).]

In Equity. Suit by G. F. Willis against John C. O'Connell. On motion for preliminary injunction, and on motion by defendant to dismiss. Injunction denied, and bill dismissed.

Armbrecht, McMillan & Caffey, of Mobile, Ala., for plaintiff.

Gaillard & Mahorner and Bestor & Young, all of Mobile, Ala., for defendant.

HENRY D. CLAYTON, District Judge. This bill is brought by Willis, a citizen of Georgia, against O'Connell, a citizen of Alabama, for injunction to restrain him from publishing in his newspaper comments and criticisms reflecting upon the plaintiff, upon a proprietary medicine and the business of plaintiff in selling the same, upon the testimonials commending the efficacy of the medicine, and upon the authors of such testimonials.

The plaintiff has the exclusive distributing agency in Alabama and five other Southern states of the Cooper Medicine Company, an Ohio corporation, engaged in the manufacture of a proprietary medicine known as and sold under the name of "Tan-lac." The medicine is shipped to the plaintiff at a certain fixed price and then resold by him at an enhanced price.

Under the agency contract, the plaintiff has a pecuniary interest in the prospective increased sales of the commodity in his allotted territory, and he avers that:

"Anything which will injure the reputation of Tan-lac, or which will adversely affect the sale thereof in said six states, or to destroy or injure or impair the popularity of Tan-lac, will seriously affect the profits and revenues of the plaintiff."

Further, the plaintiff alleges that Tan-lac has enjoyed a large sale in said six states, and has been held in high esteem by the users of proprietary medicines therein, and has been indorsed by those who have bought and used the same and received benefits therefrom.

It is also stated that the plaintiff, under his contract with the medicine company, has charge of and pays the costs of advertisements of said remedy; that by the use of newspaper advertising and the printing of the testimonials of prominent citizens in such states, who have used the remedy and received its beneficial effects, the plaintiff has built up a large and lucrative business in the sale of Tan-lac; that the compound has enjoyed the good will and esteem of a large part of the population of said states, so much so that the sale of the same in these states has aggregated 500,000 bottles during the past 12 months; and that the gross revenue from such sales during that time was more than $350,000; further, that the plaintiff has established an agency for the sale of the remedy in the city of Mobile, and has appointed an agent there; that plaintiff has recently begun advertising the article in the daily newspapers published at Mobile; that, as part of said advertisement, he has published indorsements and testimonials from a number of prominent people touching the curative properties of the remedy, and that he has done this for the purpose of increasing the popularity and sales of Tan-lac in the Mobile community, but that he has not published any advertisement in the Mobile Tribune (a newspaper published once a week), of which the defendant is editor and publisher.

Again, plaintiff alleges that the medicine company has complied with the federal and state laws regarding the manufacture, distribution, and sale of proprietary medicines; that, notwithstanding plaintiff has proceeded with his business in a lawful manner for the purpose of increasing the sale and popularity of the remedy, "the defendant has willfully, maliciously, and with the intent and purpose of injuring the reputation of Tan-lac, destroying its popularity, preventing the increased sale thereof, and for the purpose of decreasing and hampering the sale of said remedy, thereby injuring plaintiff in the profits to be derived by him from the sale of such remedy, published in said Mobile Tribune certain libelous, defamatory, and scurrilous articles regarding Tan-lac and those who have given testimonials of its curative powers, and that the purpose and intent of the publication of such articles was to hold the said Tan-lac and the plaintiff, and those who have indorsed Tan-lac and testified to its beneficial effects, up to ridicule and contempt and public scorn and derision, for the sole purpose of injuring the sale of said medicine; and that if such publications be continued it would make it difficult, if not impossible, to secure further testimonials, to the great injury of the property and rights of the plaintiff"; that in said articles so published by the defendant in the Mobile Tribune, among other things, it is said:

"Tan-lac is a skyrocket in the pyrotechnics of fakery."

Also:

"Tan-lac is another increasingly popular alcoholic nostrum that presumably fills a much felt want—want, not need—in those parts of the country where Demon Rum has been driven into the tall timbers."

And in another article:

"The medical faker is a contemptible Pharisee with an ungodly gospel. He is a poisonous viper, ambuscaded in the grass, and he should be utterly exterminated."

And then the plaintiff avers:

"That the statement above quoted was intended to apply to plaintiff, and that the object and purpose of said statement was not only to injure plaintiff in his personal reputation, but also to adversely affect, if not to injure and destroy, the sale of Tan-lac in this community."

From one of the several published articles, which are made exhibits to the bill, the following is taken:

"As was shown in the excerpts from the Journal of the American Medical Association exposing 'Tan-lac' which were published in the Tribune last week, the happy hunting grounds of L. T. Cooper and his kindred are in the prohibition states of the South where the patent medicine with the 'kick,' being easily procured, has taken the place of the straight 'red-eye' among a lot of the former topers. One of those 'recommendations' contained in the florid 'Tan-lac' advertisements published this week, was from ———, touted as a former mayor of ———. The published testimonial from Mr. ——— contained this paragraph: 'Since my second dose I have suffered none of those troubles to which I refer, and I really believe I am going to get perfectly well and strong again. Won't that be wonderful at my age? Well, certain it is that Tan-lac is a wonderful medicine, and you know that I am not given to puffing mere experiments. I am rather orthodox as to materia medica.'

"Substitute for the High-Ball.

"With the convivial reputation Mr. ——— established in ———, while he was ——— [a public officer], his statement is easily paraphrased into 'I am not given to quaffing experiments and am rather orthodox as to the brand of fire-water I consume.' As an authority on the materia medica which comes from corn through a still Mr. ——— should have a rating of AA1 in the distiller's handbook—if there is such a work published.

"Mr. ——— is a type of that peculiar infliction under which the state of Alabama has long labored, the political prohibitionist. There are prohibitionists in the state—and many in Mobile—to whom the Tribune takes off its hat in respectful obeisance. They are conscientious and consistent in their opposition to the liquor evil and they impress their fellow citizens with their honesty of purpose. But Mr. ——— is not one of these. At the time he first appeared as a prohibitionist in ——— and afterwards in ———, his daily life was the antipodes of the conscientious temperance advocate. It is stated that he was prevented from using his influence with the ——— as a director of that paper to make it an advocate of prohibition by the fact that he was at the time the owner of property in ——— which was being rented for immoral purposes.

"This is the man who thinks that 'Tan-lac' is 'wonderful at my age,' and who gives indorsement to the nostrum. And why shouldn't he get 'well' and 'strong' after a few doses of 'Tan-lac'? Enough of the stuff, with its 16% of alcohol, would make even a cripple want to kick the chief of police. Given a chaser of Tan-lac on Tan-lac, Mr. ——— would probably want to buy a 'flivver' or climb a telegraph pole."

And again the following excerpts are from the published articles which are made a part of the ground of plaintiff's complaint:

"If it is a violation of the corrupt practices act for a politician to print advertising matter in the form of news without clearly stating that it is an ad, why should patent medicine companies be exempt? In the press agent copy supplied the ——— [a newspaper] and the ——— [another newspaper] last Tuesday glorifying 'Tan-lac,' the article ran in the ——— [first newspaper] as straight news. The ——— [second newspaper] added the magic symbols 'Adv.' after it. A mere question of newspaper ethics, but the ——— [second newspaper] was the more honest with its readers."

And again:

### "A Recipe That will Save You a Dollar.

"Take alcohol, liquor or plain tiger booze,
And label it 'Tan-lac,' for 'internal use,'
Not forgetting to add in the smallest dimension
Licorice, glycerine, aloes and gentian,
And when you have finished you'll find you've devised
Common old whisky but thinly disguised."

Let me remark in passing that doubtless this doggerel would inflict much pain upon the sensibilities of a teacher of belles lettres, and should not, in his opinion, be allowed to go to print. He would doubtless say that it does not even possess the swing and jingle, the atoning grace, of a limerick. However, I am not to treat it as a poetic effusion, but as a prosy libel, which I shall do in connection with the alleged libelous utterances above and hereafter quoted.

Plaintiff avers:

"That Tan-lac is not an alcoholic nostrum; that it is not intended as a substitute for whisky or alcoholic spirits; that it is not a beverage, but that it is a legitimate remedy, prepared and sold as such, with a statement upon the label of the bottle in which it is contained that it does contain 18 per cent. of alcohol, which is a smaller percentage of alcohol than most proprietary remedies; that alcohol is a solvent and is used in many remedies as a preservative and solvent, and is so used in many remedies prescribed by members of the medical profession, and is by them recognized as a legitimate ingredient in various medicines and remedies."

And then the names of six other proprietary medicines are set out in connection, with the averment that Tan-lac contains a less percentage of alcohol than any of them, and that these other remedies are in common use.

It is averred that articles of the character mentioned have appeared in three issues of the Mobile Tribune, namely, those of March 11, 18, and 25, respectively, 1916; and copies of the articles so published are made exhibits to the bill.

It is also alleged that the defendant intends and proposes to publish another article of a similar, if not more, defamatory nature regarding said Tan-Lac, and that the publication of such an article will work irreparable harm to the plaintiff's business; that the defendant is a man without financial responsibility, and therefore has no means to respond in damages to plaintiff for the injury which plaintiff would sustain by reason of the publication of such article, and that the publication of such an article would cause irreparable injury to plaintiff, for which damages at law would not be an adequate remedy; and again that it is the purpose and intent of defendant to continue, from time to time, to print other articles of a nature similar to, if not more

scurrilous and more defamatory than, the articles mentioned in the bill regarding the said Tan-lac, with the purpose and intent of injuring and destroying plaintiff's business, and that unless such action is restrained by injunction the business of plaintiff will suffer irreparable injury, and plaintiff will suffer irreparable injury, etc.

The prayer is to enjoin and restrain—

"the defendant from publishing in the Mobile Tribune or elsewhere any article of a libelous, defamatory, or scurrilous character regarding or concerning or respecting the proprietary remedy known as Tan-lac, or regarding or concerning plaintiff, or regarding or concerning any person who has given or may give testimonials as to the curative or beneficial effects of Tan-lac."

[1] Of course, if the bill is to restrain a libel of the plaintiff, a court of chancery will not grant an injunction. This is the decided law, too long and too well established to need comment or to require citation of authority. It is also settled law in the United States that a court of chancery will not grant an injunction to restrain libelous utterances injurious to property rights and business. This was decided by Mr. Justice Bradley, sitting on the circuit bench while he was a justice of the Supreme Court of the United States, in Kidd v. Horry, 28 Fed. 773, and the rule stated in that case has been approved in a long line of judicial opinions in cases collated in the various reference books and in digests.

[2] But the plaintiff insists that his bill is not uniphase in character; that is, that the ground of relief is not predicated solely upon a libel of the plaintiff and of his property rights, but that he predicates his right to injunctive relief upon the averment that the newspaper articles published and to be published—

"are and will be libelous, defamatory, and scurrilous articles regarding Tan-lac and *those who have given testimonials regarding its curative powers,* and that the purpose and intent of the defendant in the publication of such articles was, and will be, *to hold* Tan-lac and plaintiff and *those who have indorsed Tan-lac and testified to its beneficial effects up to ridicule, contempt and public scorn and derision* for the sole purpose of injuring the sale of the said medicine, *and that it would make it difficult if not impossible to secure further testimonials,* to the great injury of the property rights of the plaintiff."

It will be observed that the inartificiality of pleading is not considered and because such defect can be cured by amendment without changing the character or purpose of the bill.

[3] This contention, the last above stated, is but an effort to bring this controversy within the class of those rare cases wherein injunction was used to prevent injury to the plaintiff's trade and business where the same was being done by the publication of circulars and other advertisements. Of these the most frequently cited case is Emack v. Kane (C. C.) 34 Fed. 46. In this connection, it must be confessed that the reasoning in some cases whereby the rights enjoyed by a man in respect to property or business is so different and greater than those others enjoyed by him as an individual is intellectual refinement, to be delighted in by metaphysicians rather than to be adopted by the courts in the administration of justice. The good citizen has the right to enjoy and use his reputation free from direct defamation as well as from

231 F.—64

vile innuendoes of a skulduddery artist who may employ the picturesque slang of the street for his embroidery. And yet, for the protection or vindication of his good name the citizen must be remitted to his remedy at law—to a civil action, or criminal prosecution, or both. This must be so, for a court of chancery in this country has never had the power to enjoin the commission of such a wrong, and cannot by stretch of authority exercise such power, and besides the Constitution of the United States, and in this jurisdiction the Constitution of Alabama, both alike, positively forbid:

"Congress shall make no law * * * abridging the freedom of speech, or of the press." Const. U. S. Amend. art. 1.

"That no law shall ever be passed to curtail or restrain the liberty of speech or of the press; and any person may speak, write, and publish his sentiments on all subjects, being responsible for the abuse of that liberty." Const. Ala. 1901, § 4.

But, if the law did not inhibit, doubtless courts of chancery would be justified by the argument of ab inconvenienti in refusing the use of its extraordinary powers to censor the public press. It is manifest that the assumption of such duty would impose upon the courts a task of insuperable difficulty.

It is not that a libel or slander is not reprehensible, not that a libel or slander may not cause irreparable injury, but because courts of chancery, in the exercise of their extraordinary powers, have refused to interfere in such cases, leaving the aggrieved party to his remedy at law; and, further, it is not within the authority of any court, or of any other governmental agency, by any sort of censorship to abridge the right belonging to every man to freely speak and publish his sentiments. It is true that this rule has been modified to some extent in England, but by statute. With us in the United States it remains unsubtracted from.

Chancellor Kent—and he lives in the estimation of the legal profession as one of the few very great chancellors—said that:

"It has accordingly become a constitutional principle in this country that every citizen may freely speak, write, and publish his sentiments on all subjects, being responsible for the abuse of that right, and that no law can be rightfully passed to restrain or abridge the freedom of speech or of the press."

In Pomeroy's Equity Jurisprudence (1906) vol. 6, § 629, the following excellent statement is made, and it is quoted, though it must be conceded that so elementary a proposition needs no supporting authority:

"Equity will not restrain by injunction the direct publication of a libel as such, however great the injury to property may appear to be. This is the rule in the United States, and was formerly the rule in England. The present rule contra rests on statute."

And again it is said in High on Injunctions (4th Ed.) vol. 2, p. 968:

"Courts of equity will not restrain publication of libels, or works of a libelous nature, even though such publications are calculated to injure the credit, business, or character of the person aggrieved, and he will be left to pursue his remedy at law."

See, also, the case of Cit. Light, H. & P. Co. v. Montgomery L. & W. P. Co. (C. C.) 171 Fed. 553, and authorities there cited. In that case it was said:

"Defendant has a right to have the truth or falsity of the issue determined by a jury trial as at common law. That it cannot get in a court of equity. * * * Neither a court of equity nor any other department of government can set up a censorship in advance over such matters, and prevent a person from exercising his constitutional right. He has the right to publish, if he chooses to take the consequences. After he has spoken or written falsely, the criminal law can punish him, and the civil court amerce him in damages. That such redress may not be adequate in all cases, and in some cannot be, is quite apparent; but the remedies named are all that the Constitution permits a court to employ against slanders upon a man's credit and business standing."

Recurring to the contention of the plaintiff, that it is the intimidation by the publication of derogatory articles against the users who furnish testimonials as to the efficacy of Tan-lac as a specific, or at least as a remedy, for which a court of chancery can use the process of injunction, it is well to consider the cases cited and relied upon in support of 'that contention.

In the case of Emack v. Kane, supra, the defendant was enjoined from sending out circulars injurious to complainant's trade and business. This is the first case cited by the plaintiff. This case was carefully weighed and analyzed by that distinguished jurist, Chief Justice Parker, in the opinion rendered for the court in Marlin Firearms Co. v. Shields, 171 N. Y. 384, 64 N. E. 163, 59 L. R. A. 310. It is there said:

"Emack v. Kane (C. C.) 34 Fed. 46, which is a decision by a single judge, seems to be the authority and support of plaintiff's contentions. A very careful examination of it, however, leads to the conclusion that its attempt to overthrow the reasoning of Mr. Justice Bradley in Kidd v. Horry, supra, was not successful."

That case is clearly distinguishable from the one made by this plaintiff.

In Farquhar v. National Harrow Co., 102 Fed. 714, 42 C. C. A. 600, 49 L. R. A. 755, defendant was enjoined from sending out letters or notices threatening plaintiff's agents and customers with suit for infringement of a patent, and this was shown to be a fraudulent attack upon the property rights of the plaintiff and *in restraint of trade or in furtherance of unfair competition.* Freedom of speech or of the press was not the question presented. The injunction was against unfair competition or unlawful restraint of trade—the controversy being between two business competitors.

It would be difficult to reconcile the opinions in patent, boycott, and restraint of trade cases. However, in none of such cases as I have examined is there found any conflict as to the general rule that an anticipated libel of person or property cannot be the subject of injunctive process. But if, and if, indeed, this Farquhar Case be a supporting authority for the plaintiff's contentions here, then I think it is balanced by the case of Flint et al. v. Hutchinson Smoke Burner Co. (C. C.) 38 Fed. 546, which is as strong against the plaintiff's position

as the other case is strong in its support. There injunction was sought to restrain the defendant from falsely and maliciously charging infringement of letters patent by notifying plaintiff's prospective customers that they would be held responsible for using such patent. The court stated:

"This is very clearly a bill to restrain the publication of a libel that injuriously affects complainant's business"

—and refused the injunction.

Adriance Platt & Co. v. National Harrow Co., 121 Fed. 827, 829, 58 C. C. A. 163, was another patent case and a contest between competitors. The freedom of the press was not involved, and in that case Emack v. Kane, supra, appears to have been the authority relied upon, instead of the better reasoned out and recognized case of Kidd v. Horry, supra; the question being there, in the Adriance Case, whether defendant should not be enjoined against threatened suits for infringement of a patent. The court said:

"Undoubtedly the owner of the patent is acting within his rights in notifying infringers of his claims and threatening them with this litigation if they continue to disregard them, nor does he transcend his rights when, the infringer being a manufacturer, he sends such notices to the manufacturer's customers, if he does so in good faith, believing his claims to be valid, and in an honest effort to protect them from invasion."

And then, further, the court said that the notices in that case—

"were inspired by a purpose to intimidate the complainant's customers, and coerce the complainant, by injuring its business, into becoming a licensee of the defendant."

So, again, it may be said that the injunction was granted *against acts* in restraint of trade, and threats, coercion, and intimidation. The right of free speech or freedom of the press was not raised.

In Dittgen v. Racine Paper Co. (C. C.) 164 Fed. 84, there was a contest between competitors over patent rights, where the plaintiff sought to enjoin the defendant from circulating by letters and through salesmen "threats of suit and dire consequences unless his claims under his patent are respected." It was held that the defendant had been guilty of unfair competition. The question of libel was not before the court.

Lewin v. Welsbach Light Co. (C. C.) 81 Fed. 904, was another instance of the infringement of a patent, and the court, among other things, said:

"* * * That if, upon the one hand, those circulars should turn out to be such notices as the defendants could rightly give, or if, on the other hand, they shall, when produced, appear to be mere libels, this suit should not be sustained."

With due deference to the plaintiff's learned counsel, I cannot agree with him that this last cited case supports the doctrine in Emack v. Kane, supra, as he construes it.

The case of Palmer v. Travers (C. C.) 20 Fed. 501, is not reported in full, but it appears that the bill there was to enjoin the defendant from threatening suits for an infringement of patent rights. It is

not clearly stated how the case was presented to the court. The bill was dismissed.

Beck v. Railway Teamsters' Protective Union, 118 Mich. 497, 77 N. W. 13, 42 L. R. A. 407, 74 Am. St. Rep. 421, was a boycott case. There an injunction was granted against acts of violence or threats of violence. But it is better to quote the language used by the court, which is:

"It is further ordered, adjudged, and decreed that said injunction shall not be construed as inhibiting said defendants from threatening to boycott, except by violence, or from boycott by peaceful means, or from the distribution of the said boycott circulars, * * * or from threatening to injure, affect, or ruin the business * * * by any effort to compel or induce said customers or others to refrain from business relations with complainant, which effort shall not be accomplished by violence or threat of violence."

Pratt Food Co. v. Bird, 148 Mich. 631, 112 N. W. 701, 118 Am. St. Rep. 601, arose on a statute of the state of Michigan creating a food and dairy commissioner, whose duty it was to prevent deception in the sale of stock food. The bill sought to enjoin the commissioner from sending out bulletins stating that plaintiff's cattle food did not come within the requirements of the act. The court said:

"Nor, as a general proposition, will the court interfere to restrain the publication of libel. But we held in Beck v. Railway Teamsters' Protective Union, supra, that injunction will lie to restrain a combination of persons from acts which tend to ruin complainant's business by bringing to bear upon his customers intimidating and coercive means. The principle which should rule the present case is identical."

In that case the right of a person to express his sentiments in print or by word of mouth was not considered. The injunction was sought to enjoin a ministerial act of a state officer.

Gilly v. Hirsh, 122 La. 966, 48 South. 422, 20 L. R. A. (N. S.) 972, does not overrule or qualify the doctrine in State v. The Judge, etc., 34 La. Ann. 744. In the Gilly Case, besides other acts complained of, the defendant was charged with the effort of preventing customers from dealing with his competitor in a store next door to the plaintiff by placing a sign in his (defendant's) window, worded:

"Don't be misled. This store window and display has no connection with the would-be auction next door. Our entrance is at the corner."

It does not appear that defendant's right to maintain such a sign was directly involved. The plaintiff prayed that the defendant be enjoined from inducing, crowding, or rushing persons from in front of complainant's show window into the adjoining shop, and from representing to persons who stopped at complainant's window that complainant's store was part of said auction shop, and from in any manner interfering with the orderly conduct of complainant's business. The court said that the—

"defendant no doubt, has the right to maintain a sign in his window notifying the public that the window is his and has no connection with the business carried on next door."

The words, "defendant has a right to maintain a sign," found in the above quotation, appear to be all that was said tending to show—

if, indeed, it has such tendency when considered with the context—that the matter of publication was touched upon.

The counsel for plaintiff cited other cases; but they are not, in so far as the present case is concerned, essentially different from those reviewed. Some of the cases cited may resemble, in some nonessential respects, the one here to be determined; but they are not any more like it than those which have been covered by the foregoing comments. "Nullum simile est idem."

I think it not unfair to say that the cases cited and relied upon by the plaintiff, as a general proposition, may be divided into three classes: (1) Where patent rights were infringed; (2) where unlawful violence was threatened and imminent; and (3) where unfair and illegal methods were resorted to by competitors in trade. Of course, this case does not involve the infringement of a patent, or any threatened unlawful violence, or any unfair competition in trade.

[4] The plaintiff's averment that the defendant is financially unable to respond in damages can add no force to the plaintiff's case. Of course, it is a general rule that, where a plaintiff has undoubted rights that are not adequately protected by remedy at law, he may have the aid of equity; but the mere fact that the defendant cannot be compelled to pay a judgment at law cannot make the plaintiff's remedy there inadequate, nor can such fact render the plaintiff's injury irreparable in such sort as to authorize this court to take equitable cognizance of plaintiff's grievance. To be sure, this is so, for considering this case in this aspect, it is resolved into this: The plaintiff's remedy at law is inadequate, and his injury is irreparable, because the defendant is insolvent; and if this be a sound principle we must conclude that a rich man is allowed to freely utter libels, subject only to action for damages and criminal prosecution in a court, where he can have his rights passed upon by a jury; whereas the poor man is deprived of a trial by jury because he is poor, and subject, I may say, to the summary injunctive process of chancery. Such cannot be the law.

There are, it is true, many cases of trespass to realty, involving probable and threatened injury to property and property rights only, where injunction was granted on the ground that the injury would be irreparable. The law governing in such cases is, in Deegan v. Neville, 127 Ala. 471, 478, 29 South. 173, 175 (85 Am. St. Rep. 137) well stated to be:

"What is an irreparable injury is often difficult to determine; but it must in all cases be determined by the particular facts shown in the case under consideration. It is said by Pearson, J., in Gause v. Perkins, 56 N. C. 179 [69 Am. Dec. 728]: 'The injury must be of a peculiar nature, so that compensation in money cannot atone for it; where, from its nature, it may thus be atoned for, if in the particular case the party be insolvent, and on that account unable to atone for it, it will be considered irreparable.'"

The case of Deegan v. Neville, supra, and the case of Gause v. Perkins, cited in the quotation, involved trespass to realty. Of course no such case is presented by this plaintiff, and I can find no authority, and no good reason has been suggested, that because a defendant is

insolvent he may, on such account, be enjoined from printing a libel, although the libel may indirectly injure the plaintiff's business.

In this connection it is profitable to read the case of Whitehead v. Shattuck, 138 U. S. 146, 11 Sup. Ct. 276, 34 L. Ed. 873, where the court considered the Seventh Amendment to the Constitution of the United States, declaring that "in suits at common law, where the value in controversy shall exceed twenty dollars the right of trial by jury shall be preserved," and said:

"That provision would be defeated if an action at law could be tried by a court of equity, as in the latter court a jury can only be summoned, at its discretion, to ascertain special facts for its enlightenment. Lewis v. Cocks. 23 Wall. 466, 470 [23 L. Ed. 70]; Killian v. Ebbinghaus, 110 U. S. 568 [4 Sup. Ct. 232, 28 L. Ed. 246]; Buzard v. Houston, 119 U. S. 347, 351 [7 Sup. Ct. 249, 30 L. Ed. 451]. And so it has been held by this court 'that whenever a court of law is competent to take cognizance of a right, and has power to proceed to a judgment which affords a plain, adequate, and complete remedy, without the aid of a court of equity, the plaintiff must proceed at law, because the defendant has a constitutional right to a trial by jury. Hipp v. Babin, 19 How. 271, 278 [15 L. Ed. 633]."

Of course, the provision of the United States statutes forbidding equity suits in federal courts where there is an adequate remedy at law is declaratory of what was always the law and was intended to emphasize the rule. N. Y. Guaranty Co. v. Water Co., 107 U. S. 205, 2 Sup. Ct. 279, 27 L. Ed. 484; Buzard v. Houston, 119 U. S. 347, 7 Sup. Ct. 249, 30 L. Ed. 451. The want of a remedy is entirely distinct from the inability to obtain the fruits of a remedy; and where there is a complete remedy at law, the fact that there is difficulty in its execution will not authorize the court of equity to grant relief. Thompson v. Allen Co., 115 U. S. 550, 6 Sup. Ct. 140, 29 L. Ed. 472.

In the very able supplemental brief of plaintiff's attorneys it is insisted that although the court may not enjoin a libel of plaintiff personally, or of his property, or a libel of plaintiff's customers, as simply a libel, that yet the court ought to enjoin the defendant from libeling the plaintiff's present and future customers, because such libel "would make it difficult, if not impossible, to secure further testimonials, to the great injury of the plaintiff." In other words, the plaintiff's case, by this apparent concession coupled with this last contention, is reduced to this: injunction is prayed for because plaintiff says that he will have other customers; that such customers, or some of them, out of those who may buy 500,000 bottles of his medicine, or other large number, per annum hereafter, would probably be willing to give testimonials to the efficacy of his medicine; and that probably the publication by defendant of unfriendly comments on such testimonials and wrongful strictures on the authors would curtail the sales of plaintiff's medicine in the community where the defendant's newspaper is circulated.

This is believed to be not an unfair statement of plaintiff's case. If so, I think he goes very far afield. In view of the large number of customers that the plaintiff has, and that he claims he will have hereafter, it is not probable that any considerable number, who may desire

to give testimonials, would be deterred from doing so by the publications made by defendant. It is not probable that defendant would cover, by the circulation of his weekly newspaper, very much of the large territory embraced in the states of Alabama, Mississippi, Florida, Georgia, Tennessee, and Arkansas. Nor is it probable that the defendant will, with any sort of exaggeration or distortion of facts, publish derogatory utterances of any very considerable number of plaintiff's probable customers. Doubtless, if he should attempt to make such extensive publication, he would encounter insuperable difficulties and subject himself to numerous actions and prosecutions for libel. Very likely the difficulty of the task and the prospect of being amerced in damages and punished for criminal offenses will restrain the defendant from abusing his privilege to freely publish his sentiments. However that may be, the probable imposition of damages and punishment is the only deterrent afforded by the law.

[5] Perhaps I may be justified in taking a further view of this case; that is to say: Has not the defendant the right to question the efficacy of plaintiff's remedy—to expose it as a nostrum, if it be a nostrum? The plaintiff, on his side, informs us that he is spending large sums of money for advertising his remedy in the newspapers, and that he intends to continue this method for increasing the sale of the same. This he has a right to do, and the medicine may not be a nostrum; and it may be true that, if properly used in some cases, the medicine will prove of benefit to suffering men and women. In short, the plaintiff may be in every good sense rightfully earning such money; and the defendant may be endeavoring to injure, and may intend to continue to injure, the plaintiff in his right to accumulate a fortune by the sale of the medicine. But the plaintiff has questioned the right of the defendant to criticize the remedy, to make statements as to its therapeutic value; and the plaintiff has also questioned the right of the defendant to criticize the testimonials in laudation of his remedy, and, in connection with the criticisms of such laudations, to say something touching the personal history and habits of those who give such testimonials.

May not a newspaper publisher expose, if he can, the plaintiff's medicine—if it be a quack medicine? May he not in good faith tell the public of the dishonesty and fraud practiced upon the public? Is there anything so sacred about proprietary medicines, or those who cooperate in a plan to further their sales and increase the profits of the vendor, that a newspaper man shall be required to cease publishing what he believes to be the truth, or cease to attack the business methods of medicine vendors, when and where he believes the co-operating testimonials, in furtherance of the scheme to sell such medicine, are sinister and not founded in truth? I think he may do so, but within the limits of the law which prescribes penalties, civil and criminal, for libelous publications.

Again, why may not any man publish his warning to his fellow sufferers not to use what he honestly believes to be a nostrum, but rather, on the other hand, to take the advice of a competent physician

and his medicine also, if any be prescribed? The allegation of the plaintiff that some medicinal compounds are sometimes prescribed by physicians cannot aid the plaintiff in his application for an injunction. It may be conceded that such practice is sometimes followed, but it must not be forgotten that in such cases it is followed, not without the benefit of the learning and discriminating judgment of the man specially taught and skilled in diagnostics and well informed as to the therapeutic value of drugs, and their use or harm when rightly or wrongly compounded or administered in proper or improper cases. Every intelligent layman knows, or ought to know, that the formulas of many standard medicinal compounds are printed in the United States Pharmacopœia (approved by the medical profession and adopted as the standard for the country by Act Cong. June 30, 1906, c. 3915, 34 Stat. 768 [Comp. St. 1913, §§ 8717–8728]), and that these compounds are frequently used by good physicians. And every wise layman ought to know that the physician uses his learning, experience and judgment in prescribing any medicine, simple or compounded.

Why may not the newspaper man advise people to consult a doctor rather than take a widely advertised remedy, or why may he not suggest that a man afflicted with an exceeding great thirst ought to confine himself, preferably, to the use of water, milk, and grape juice, or take a "high-ball," or a "whisky straight," or a compound made by himself of "corn," "bourbon," or "rye" and water and sugar, rather than drink a mixture of aloes, glycerine, licorice, and gentian, advertised and sold for whatsoever purpose under whatsoever name.

There is no intimidation of the plaintiff in this case, unless it can be said that a mere newspaper criticism is an intimidation. There is no intimidation or hindrance of any of the customers of the plaintiff in buying the medicine of the plaintiff. The case made by the bill shows that the defendant has animadverted on the testimonial of one man, and the man himself, and that defendant threatens to make other similar strictures upon like testimonials and their authors. The author of the testimonial criticized in this case, and those who may stand in his like place hereafter, if libeled, will have their remedy or remedies as the law provides. The plaintiff here is not their guardian, nor can he make his case one where the court must, at his instance, give such people who are strangers to this suit, any protection by injunction now prayed for against any libelous utterances made or to be made by the defendant against such person or persons. This court cannot restrain the libel of the plaintiff or his medicine; and for greater reason, certainly, the court cannot, at the instance of the plaintiff, restrain a libel of persons not parties to this suit.

In my view, if the defendant's publications, which for present purposes may be conceded to be libelous, should lessen the plaintiff's sales and the profits from his business, this fact would furnish no reason why this court should interpose its injunction against such publications. Again, ought not the question of whether the defendant is, or is not, warranted in making such publications to be determined by a jury? Moreover, under the facts presented by the bill, is not the defendant's

side of this controversy justiciable in a court of law, and only in such a court? I think so.

In the oral argument it was mildly suggested that the references made by defendant's counsel to those fundamental and inalienable rights embraced in the Bill of Rights, and the inheritance of every American citizen, were in the nature of a Fourth of July oration, and ought not to influence the court against plaintiff's theory that probable intimidation of probable customers of the plaintiff, not from buying his medicine, but from furnishing testimonials in regard thereto, should be a ground for injunction. But the suggestion is met by the insuperable fact that in any justiciable cause at least some of these rights are involved and must be respected. We cannot conceive of the administration of a government of laws, and not of men, without recognizing the right of trial by jury; the right of one to be confronted by his accusers; the right to be heard by self or counsel; the right to due process of law; the right to the equal protection of the law; the right not to be discriminated against on account of race or color; the right to worship God according to one's conscience; and the right of the citizen to freely speak and publish his sentiments, subject only to lawful punishment, or damages, or both, for the abuse of this last right—a privilege of inestimable value in a land of free people.

This cause having been submitted upon the application of the plaintiff for injunction, as above stated, and at the same time upon the motion of the defendant to dismiss the bill for a want of equity, I have reached the conclusion that injunction must be denied, and that the motion to dismiss the bill must be granted.

It is accordingly decreed.