Glenn A. Kenderdine and Modern Woodmen of America, Appellants, v. A. E. Rouland et al., Appellees.

Gen. No. 8,460.

at the October term, 1930.
Opinion filed January 26, 1931.

GEORGE G. PERRIN, NELSON C. PRATT and SONNEN-SCHEIN, BERKSON, LAUTMANN & LEVINSON, for appellants.

JOHNSON & PEFFERLE and THOMAS W. HOOPES, for appellees.

MR. JUSTICE ELDREDGE delivered the opinion of the court.

The original complainant in the bill of equity filed in this case was Glenn A. Kenderdine, a certificate holder in the Modern Woodmen of America. After a notice to all the defendants of an application for a temporary injunction, the Modern Woodmen of America, a fraternal beneficiary society, which had been made a party defendant, petitioned the court to be

realigned as an additional complainant. The petition was allowed and the latter became a party complainant. Upon a hearing for a temporary injunction an order was entered restraining the defendants from using the name ''National Modern Woodman Protective Association'' or the name ''Modern Woodmen'' or the name ''Modern Woodman'' or the name ''Modern Woodmen of America'' as part of the title of any association, corporation, organization or pretended organization heretofore formed or which may hereafter be formed or pretended to be formed, and from advertising or holding themselves out as officers of any association, corporation, organization or pretended organization using the name ''Modern Woodmen'' or ''Modern Woodman'' as part of its title. After the chancellor had indicated that the injunction order would be limited as above set forth a motion of defendants was granted for leave to withdraw their answer to the bill, and after the answer had been withdrawn they entered their motion to dismiss such parts of the bill of complaint as were not covered by the order of the temporary writ of injunction, for want of equity. This motion was granted and an order entered dismissing that part of the bill not covered by the order for the temporary writ of injunction for want of equity. From this order dismissing the remaining part of the bill for want of equity this appeal is prosecuted.

The motion to dismiss that portion of the bill mentioned for want of equity operated as a demurrer *ore tenus,* and all the material facts aptly pleaded in the bill must be taken as true in considering the error assigned.

The bill is very lengthy and sets out the history of the Modern Woodmen of America since its organization in the year 1883, and that it now has in this country and Canada more than 13,125 subordinate

bodies known as local camps; nearly 1,000,000 bene-
ficial members and about 10,600 social members; that
said society has had since its organization a lodge
system, ritualistic form of work and representative
form of government; that its supreme governing body
is the Head Camp composed of the head officers of the
society and delegates elected by the various State and
provincial camps. The bill then sets out the various
rates prevailing during different periods of its exist-
ence and alleges that at the end of the year 1928, the
society had in force insurance in the sum of $1,128-
919,000 on members who had joined prior to July
1, 1919; that assessments paid by these members dur-
ing the year 1928 amounted to $16,060,011.60; that the
death and disability benefits paid during 1928 on ac-
count of insurance of these members amounted to
$23,243,500.00, an excess of $7,183,489.00 over the con-
tributions of these members; that on December 31,
1928, the society was 51.95 per cent actuarily solvent;
that the legislatures of the States of Michigan, In-
diana and Pennsylvania had enacted laws which re-
quire that all fraternal benefit societies doing busi-
ness in such State shall, within a given period of
time, be placed upon an adequate premium basis, that
is, that they shall be 100 per cent actuarily solvent;
that the State of Maryland requires such a society to
be at least 90 per cent actuarially solvent and that the
commissioner of insurance of that State had refused
to issue a license to the Modern Woodmen of America
to continue to transact its business therein after July
1, 1929, unless said society increased its rates so that it
would be 90 per cent actuarially solvent; that because
of the society's low rate of actuarial solvency it had
not been permitted to transact business in various
provinces of Canada nor in the States of Massachu-
setts or South Carolina; that the commissioner of in-
surance of the State of South Carolina gave notice

to the society that unless some new plan were adopted by the society to halt its constantly decreasing actuarial solvency, he would refuse to relicense the society in that State at the end of the year; that during the month of April, 1929, and continuing until after the conclusion of the convention of the Head Camp held June 4 to June 7, 1929, an official examination of the affairs of said society was made by examiners representing the insurance departments of the States of Illinois, Missouri, Kansas, South Dakota, North Dakota, Wyoming, Indiana and New York, which examination developed fully the inadequate basis upon which the society was then operating and would undoubtedly have resulted in cancellation or discontinuance of the license of the society to continue to carry on its business therein unless appropriate action had been taken by said camp of June, 1929, to remedy the situation; that had the society continued to operate upon the table of rates adopted in 1919 it would have become unable within three or four years to meet in full the accrued death claims; that immediate and decisive action was necessary to avert bankruptcy and failure of the society and disastrous loss to its members and the beneficiaries named in its 1,000,000 insurance certificates; that at the regular quadrennial meeting of the camp on June 6, 1929, certain by-laws in regard to the rates to be paid by the certificate holders were adopted in order to insure the perpetuity of the society and to prevent its imminent insolvency and inability to pay its outstanding benefit certificates; that shortly after the adoption of the 1929 plan of readjustment a bill of complaint was filed by certain members of the society against the Modern Woodmen of America and its chief executive officers and directors in the circuit court of Cook county to enjoin the defendants from enforcing said changes in the by-laws of the society adopted at the June convention

in 1929; that the final termination of this case is shown by the opinion of the Supreme Court of this State in *Jenkins v. Talbot,* 338 Ill. 441, which decision fully sustained the action of the convention of June 1929; that about 650,000 members of the society are now holding insurance contracts and are paying the level rate of assessments as provided by the by-laws adopted at the June, 1929, convention; that there are still about 350,-000 members whose insurance has not been rewritten; that if the certificates issued prior to July 1, 1929, are rewritten preponderantly by members who are uninsurable or poorer insurance risks and there is considerable lapsation by members who are better insurance risks, the result will be that the members remaining in the society will suffer a mortality experience less favorable than the mortality table of the society which is based on the average condition of health of all the members; that lapsation of insurance by a considerable portion of the 350,000 members not yet paying assessments on the level rate basis, is more likely to be lapsation by members who can readily obtain substituted insurance in other societies or companies, resulting in adverse selection of risks still to be carried by Modern Woodmen of America; that it is of the utmost importance to said society and all of its members that substantially all existing benefit certificates be rewritten on a level rate basis in order to avoid adverse selection by lapsation; that although all members who joined prior to July 1, 1919, have the right to continue to carry their insurance on the step rate basis, due to the increasing age and rapidly increasing mortality among such older members such step rates become prohibitive at advanced ages when there is decreasing ability to pay assessments, and that unless the members now carrying insurance on the current cost or step rate basis rewrite their insurance without delay there will be a high percentage of lapsation and consequent loss to

beneficiaries of such members of insurance protection; that such lapsation and the discouragement of such older members will very seriously curtail the possibility of inducing new members to join the society and thereby the protective and fraternal influence of the society throughout the vast territory of its activity will be greatly and irretrievably diminished.

It is further alleged in the bill: "Plaintiff further avers that the defendant A. E. Rouland is engaged in the insurance business and is the local agent for the City of Springfield, Illinois, of an old line life insurance company; that the defendants Robert Johnson and L. G. Pefferle are lawyers, with offices at Springfield, Illinois; that the defendant John W. McKissick, formerly of Beatrice, Nebraska, recently became a resident of Springfield, Illinois; that said defendants, all of whom are members of the Modern Woodmen of America, together with divers other persons to the plaintiff unknown, pretending to be opposed to the plan of readjustment adopted by the Head Camp of said Society on June 6, 1929, wrongfully, fraudulently and maliciously conspired, combined, confederated and agreed among themselves to foment dissatisfaction and dissension in the society and to injure and destroy the good name, reputation and business of the society intending and planning to take advantage of the dissatisfaction and dissension thus fomented to collect donations from members and local Camps of the society for their own use and profit and to the end that said defendants Johnson and Pefferle would receive large sums as fees for alleged legal services, and to the end that said defendant Rouland would augment his insurance business and reap large profits and gains therefrom, to the detriment of Modern Woodmen of America, and to the end that each of said defendants would receive a share of such donations in the form of salaries and expense

accounts; that pursuant to said conspiracy and as a part thereof said defendants are carrying on a campaign of malicious misrepresentations and calumnies against said Modern Woodmen of America, the executive officers and directors of the society, the delegates who composed the Head Camp of June, 1929, said Frank W. Pearson, Inc. and its employees, in order to destroy confidence in Modern Woodmen of America and to destroy its patronage and to defraud said society by inducing their co-conspirators and confederates to appropriate funds of the local Camps of said society to the use and benefit of said defendants and to bring said society and its officers into public scandal and disgrace.

"25. Pursuant to said conspiracy said defendants organized themselves in a pseudo-organization first called 'Modern Woodman of America Rate-Increase Protest Association' and more recently called 'National Modern Woodman Protective Association'; that the defendant Rouland holds himself out as the president of said pseudo-organization, the defendant McKissick as secretary-treasurer and the defendants Johnson and Pefferle as the attorneys of said pseudo-organization; that the headquarters of said pseudo-organization is in the Reisch Building at Springfield, Illinois, where the offices of said defendants Johnson and Pefferle are located; that said defendants, under the former and present names of said pseudo-organization and in some instances under their own names, have issued, published and circulated and are now issuing, publishing and circulating among the members of the society and the public generally divers bulletins, pamphlets, re-prints of speeches, re-prints of newspaper articles which they had caused to be inserted in various newspapers, and other printed, mimeographed, multigraphed, typewritten and written matter containing defamatory, misleading and false

statements concerning Modern Woodmen of America, its officers and directors, its 1929 Head Camp, said Frank W. Pearson, Inc., and concerning the affairs of the society, its financial condition and method of carrying on its business; that among such publications so issued, published, circulated and disseminated by said defendants are exhibits Nos. 2 to 12 attached to this bill of complaint and expressly made a part hereof; that in and by said publications, and otherwise, said defendants and their confederates and agents have been and are now engaged in making the following, among other, false, malicious, misleading and defamatory representations, namely:

"(a) The Supreme Court (meaning the Supreme Court of Illinois) did the unexpected. After holding that the Head Camp rate of June, 1929, was unreasonable and not uniformly spread, a majority of the court reversed itself and said in substance that the Head Camp could do pretty much as it pleases. We know how the court reversed itself, but we don't know why (meaning and intending thereby to impute to the Supreme Court of Illinois motives for its decision other than consideration of the legal principles involved and the reasons stated by the court in its opinion).

"(b) The plan (meaning the 1929 plan of readjustment) was rushed through the Chicago Convention (meaning the Head Camp held at Chicago during June, 1929) amid confusion, on a minority report, after certain other by-laws were adopted and many of the delegates had left.

"(c) The head officers of the society started out nearly a year in advance of the date set for convening of the Head Camp to hand-pick delegates to the convention. Not only were such delegates selected as were in complete sympathy with the desires and purposes of the head officers, but in addition to that these delegates were carefully trained in order that the officials

of the society might put into effect whatever plans or scheme they might care to adopt.

"(d)   When the by-laws providing for the increase in rates had been adopted, Head Consul Talbot stated from the platform that the Executive Council had decided to have the Frank W. Pearson corporation of Chicago do the transferring.   I herein now charge that a conspiracy existed between the head officers of the Modern Woodmen of America and the Frank W. Pearson corporation (meaning thereby that the head officers of the society were receiving a portion of the commissions paid to Frank W. Pearson, Inc., by the society).

"(e)   The state law provides for holding a referendum on by-laws (meaning thereby the by-laws of the society fixing the schedule of assessment rates) before they are put into effect.

"(f)   About $1,000,000 of the Woodmen money was lost through bank failures, notably in Iowa, because deposits were not protected and loans were made on inflated real estate values greater than the value of the property, causing depletion of the reserve.

"(g)   We demand a general reduction of the exorbitant salaries which the head officers have so generously allowed themselves.

"(h)   That we urge the organization in the various states opposing this change in rates to take such legal steps immediately as may be necessary to determine whether or not the banks which have these deposits (meaning deposits of the money of the society) are paying any interest to any person or persons other than 2 per cent paid to the society (meaning and intending thereby to imply that the officers of the society were personally receiving from banks moneys for permitting funds of the society to remain on deposit in said banks at 2 per cent on daily balances.

"(i) That the officers and directors of the society spent $10,000,000 of the money of the society contrary to the laws of Illinois and the by-laws of the society; that they paid delegates to the Head Camp $15 a day for attendance for fifteen days while the convention lasted only four days, said overpayments amounting to $84,810.

"(j) We condemn the enormous, reckless, unwarranted and unlawful expenditure of Modern Woodmen funds by our head officers and in their unneighborly conduct of making a political hash box of our society.

"(k) Our laws should restrict expenditures of the general fund to the end that it may be used only for legitimate purposes and not for the benefit of our head officers so that they can perpetuate themselves in office (meaning thereby that the head officers have used the funds of the society for illegitimate purposes).

"(l) While these officers (meaning thereby the officers of the society) have been drawing all of this money from the Modern Woodmen of America, most of them were engaged in other lines of business. For years Head Consul Talbot has owned and conducted the Highway Motor Underwriters of Kansas City, Mo., with the executive office in Lincoln, Nebraska. We are also informed that he owns and controls what is known as the Woodmen Accident Insurance Company. Now, what about George Hatzenbuhler, one of our national Directors? Well, he is, or was as late as May 11, 1929, secretary of the Illinois Highway Motor Underwriters, Inc., Illinois managers of Highway Motor Underwriters, the organization owned by Head Consul A. R. Talbot. S. S. Tanner, one of the national directors, was at the time of his death last spring president of the Illinois Highways Motor Underwriters, Inc.

"(m) The head officers (meaning thereby head officers of the society) have deliberately planned to

gradually change the Modern Woodmen of America to a mutual legal reserve life insurance company so they may perpetuate themselves in office and draw large salaries.

"(n) Whereas the head officers of the Modern Woodmen of America, by their neglect of Modern Woodmen business and by their wrongful seizing of the power which belongs to the membership, have forfeited all right of confidence of Modern Woodmen membership.

"(o) If this plan (meaning thereby the readjustment plan of June 6, 1929) adopted at Chicago is allowed to stand, the great fraternal society which we so dearly loved will be nothing but an ordinary life insurance company.

"(p) We will never allow the Modern Woodmen to be turned into an old line life insurance company. It must remain a fraternal benefit society (meaning thereby that by the 1929 plan of readjustment Modern Woodmen of America would cease to be a fraternal benefit society and become an old line life insurance company).

"(q) The Head Camp is violating the contract of insurance with the members by changing from the assessment plan to the legal reserve plan.

"(r) Neither will we permit the head officers to sell out the membership. Are you going to let this bunch of traitors and deceivers at Rock Island (meaning thereby the head officers of the society) get away with this stuff? See that every member attends camp meetings hereafter and prevent Ray (meaning J. G. Ray, Head Clerk of the society) and Talbot (meaning thereby A. R. Talbot, Head Consul of the society) and other traitors (meaning thereby other officers of the society) from putting in more of their deceitful work. We won't stop until every last traitor (meaning thereby the officers and directors of the society) at Rock Island is thrown into the street.

"(s) It would seem that they (meaning thereby the officers of the society) had changed over comparatively few members (meaning thereby that only a comparatively few members had rewritten their certificates to the level rate assessment plan).

"(t) We (meaning thereby the said defendants) have an almost unanimous membership offering their moral and financial support.

"26. And plaintiff avers that each of said representations made by said defendants as aforesaid was and is false and known by said defendants to be false when made, and was made, published and circulated by said defendants in utter disregard of the truth and with the wrongful, malicious and unlawful purpose thereby to further the conspiracy of said defendants to injure and destroy the business of the Modern Woodmen of America."

It is further alleged in the bill that by reason of the acts and conduct of the defendants and the disaffection and the dissension of the members thereby created, more than 100,000 members of the society have lapsed their membership; that many of those so lapsing their insurance were younger men, in good health, and good insurance risks; that by reason of the disaffection and dissension so created the society has been unable to obtain many new members; that notwithstanding said decision of the Supreme Court said defendants and their confederates, agents and servants have continued their unlawful course of conduct, and are threatening to continue the course of conduct with which they are charged in this bill, and will carry out such threats unless restrained and enjoined by the order of this court; that to permit the further carrying out of the conspiracy and to permit the continuance of their course of conduct would result in great and irreparable damage and injury to the society, substantial interference with its business, and

its ultimate destruction and inability to meet its beneficial certificates as they mature; that the effect of the false representations and wrongful acts of defendants is so insidious and so difficult to trace and refute that it is impossible to measure the damage done and that hereafter will be done thereby; that the said defendants are utterly insolvent and unable to respond in damages to the society, could the society trace in money the damage done by said defendants through their conspiracy aforesaid. The prayer of the bill asks for an injunction restraining the defendants from doing the acts complained of.

It is the contention of appellees that that part of the bill which was dismissed for want of equity simply attempts to enjoin appellees from publishing libels because part of the relief asked is to restrain the appellees from maliciously charging the officers of the association with being robbers, misappropriating the moneys of the association and other felonies which in themselves are mere libels, and that a court of equity has no jurisdiction of the subject matter. To this we cannot agree. Such libels are but incidental to the main objects of the bill which are to restrain appellees from doing unlawful acts which would ultimately result or may ultimately result in the destruction of the association and cause immense loss to the certificate holders thereof. The facts in this case as set out in the bill are not intrinsically different from those which appeared in the case of *National Life Ins. Co. v. Myers,* 140 Ill. App. 392. In that case the same contention was made that is made in this case, that a court will not enjoin the publication or circulation of a libel. In disposing of this question the court said in part:

"If a libelous publication is in violation of a valid contract, if it is in pursuance of a wrongful conspiracy to destroy property rights and injure the business of appellee, if the parties issuing the libelous publications

are insolvent and no remedy at law exists, if it is inflicting irreparable injury the extent of which cannot be definitely ascertained and for which there is no adequate remedy at law, if the bill shows that not only by publications, but by letters to appellee's agents and employees, appellant is interfering with appellee's business, is seeking to cause policyholders to lapse their policies and to cause its business to be so far ruined as to throw it into the hands of a receiver, and all this wronfully and with malicious purpose, it is difficult to see why equity should withhold its preventive authority.''

Another part of the opinion in that case is also very applicable to the case at bar and we adopt it as pertaining to the facts disclosed in the bill in this case:

''In the case at bar the publications are, according to the bill, more than mere libels, and where, as here, the bill distinctly avers essential facts forming the basis of the prayer for relief so as clearly to apprise the appellant of what he has to meet, it is not necessary that it contain the evidence or recite the circumstances in detail which would support its general statement. The present bill is particularly full in this respect. It clearly shows an irreparable damage which would not be adequately compensated by action at law. The injunction does not attempt to restrain a mere libel. It restrains wilful, malicious and irreparable injury to appellee's property rights, for which the bill shows there is no other adequate relief.''

The *Myers* case, *supra,* but followed and applied the principles of law announced in a number of other decisions in this State. *Carpenters' Union v. Citizens Committee,* 333 Ill. 225; *Wilson v. Hey,* 232 Ill. 389; *Barnes & Co. v. Typographical Union,* 232 Ill. 424; *O'Brien v. People,* 216 Ill. 354; *Doremus v. Hennessy,* 176 Ill. 608. The same rule is announced in *Maytag Co. v. Meadows Mfg. Co.,* 35 F. (2d) 403, in which a certiorari was denied by the Supreme Court of United

States. Also in *Evenson v. Spaulding,* 150 Fed. 517; *Emack v. Kane,* 34 Fed. 46; *Beck v. Railway Teamsters' Protective Union,* 118 Mich. 497.

Under the allegations in the bill appellees unlawfully and maliciously entered into a conspiracy to do, and have done under said conspiracy, acts which have and will result in irreparable injury to the Modern Woodmen of America and to the certificate holders thereof. This is all admitted to be true by the demurrer and appellants are entitled to protection from such unlawful acts. The decretal order of the chancellor in dismissing that part of the bill dismissed is reversed and the cause is remanded with directions to overrule the motion to dismiss, rule the defendants in the bill to answer the same and hear the case upon its merits.

*Reversed and remanded with directions.*

Mr. Justice Shurtleff took no part.