(No. 30031.—

Montgomery Ward & Co., Appellant, *vs.* United Retail, Wholesale & Department Store Employees of America, C.I.O., *et al.,* Appellees.

*Opinion filed March 18, 1948—Rehearing denied May 13, 1948.*

STUART S. BALL, JOHN A. BARR, and FRANCIS D. ROTH, all of Chicago, for appellant.

FRANCIS HEISLER, of Chicago, for appellees.

Mr. JUSTICE GUNN delivered the opinion of the court:

Montgomery Ward & Co., Incorporated, hereafter referred to as Wards, filed a complaint in the superior court of Cook County against the United Retail, Wholesale & Department Store Employees of America, (a union) unincorporated, and its subordinate local unions and officers, and members of such unions, to enjoin and restrain them, or their members, from issuing, publishing and circulating certain papers, pamphlets and publications, claimed to be defamatory and libelous, and for damages and other relief. The defendants filed a motion to dismiss the complaint, as amended, which was overruled by the trial court. The defendants elected to stand by this motion, and the court issued a permanent injunction of broad scope, by which the defendants were enjoined from conspiring together to publish, or cause to be published, or to assist or encourage any other organization to publish untrue statements concerning the plaintiff, its officers, or working conditions, for the purpose of causing the plaintiff's employees, or prospective employees, to fear, dislike, or distrust the plaintiff, or its officers, or from causing plaintiff's customers, or its prospective customers, to dislike, or distrust the plaintiff, or its officers. It also issued a like injunction for the same purpose to prevent the defendants from acting in concert instead of conspiring, the only difference being that one charged conspiracy and the other charged actions in concert. Defendants appealed to the Appellate Court for the First District, which reversed the decree of the superior court, and remanded the cause with directions to dismiss the same for want of equity. We have allowed plaintiff's petition for appeal to this court.

The Appellate Court made a full and accurate statement of the facts, as shown in 330 Ill. App. 49, but a somewhat condensed statement is necessary here to bring out clearly the points upon which the case must be decided. Montgomery Ward & Co. has a general office in Chicago, and is engaged in the retail sale and mail order business of merchandise, and does business in every State, operating approximately 650 stores and warehouses. It is alleged that its sales aggregate over $600,000,000 annually, and it employs from 65,000 to 85,000 employees, and that it has been in business for more than seventy years, and has a reputation for honesty, fairness and integrity. Among the places in which there are substantial sized stores are Chicago, Kansas City, Denver, Albany and Jamaica. These places are especially referred to because the publications complained of come chiefly from these locations.

The complaint charges that the United Retail, Wholesale & Department Store Employees of America is an unincorporated association and acts through its officers; that Samuel Wolchok is president; Leonard Levy is vice-president, and Michael Mann and Sandra Slotkin are State of Illinois representatives; that the suit is brought against all members in a representative capacity, and that it has many local subordinate unions. Among these are Local 20 of Chicago, Local 269 in Denver, Local 131 at Kansas City, Local 332 in Detroit, Local 40 at Albany, and the Jamaica Local Union. The names of all of the officers of these several unions are set forth, and they are made parties, together with the members. The complaint also charges these unions were certified for bargaining in labor and employment matters with Wards.

It is also charged that the International Union gives advice and orders to local unions, and that it published a periodical for the information of all of the members of the union; that the Chicago Local Union published a pamphlet called the Spotlight, and that the other locals at

Denver, Kansas City, Detroit, Albany and Jamaica also publish pamphlets which are distributed to the general public, and to members of the union, and that altogether they had give out more than 400 statements concerning Wards, or its officers, or its management, and that all of these statements were untrue.

The complaint also alleges that these unions and officers agreed and conspired to act in concert against the plaintiff for the purposes above alleged, and then sets forth the numerous statements and publications claimed to be made and authorized, in pursuance of said combination and conspiracy, and that they have continuously since March, 1940, persisted in publishing and issuing statements that are defamatory and libelous and refer to the officers and staff of Wards in scurrilous and opprobrious terms, as set out in the several statements, articles and publications attached to the complaint, and that all of said articles are defamatory and untrue and made for the purpose of injuring and damaging the plaintiff; that the defendants intend to continue the publications unless restrained by the injunction of the court; that its remedy at law is inadequate because it would require many suits, that it cannot recover financial remuneration from the individual members because of their number and the time and expense necessary to bring suits; that it has been damaged more than $1,000,000, and that its only relief is by way of injunction against commission of the acts, which it says will cause the public and the employees to fear, distrust, and dislike the plaintiffs, its officers and representatives.

The discussions of counsel cover a wide range, from libel and slander to constitutional law, but with little discussion of what we believe to be the crucial issue in the case. At the outset it must be observed that for the plaintiff to obtain the relief prayed in its complaint it must bring itself within the exceptions to two general principles denying injunctive relief from publishing defamatory mat-

ters. The first general principle is that equity does not have jurisdiction to enjoin the commission of crimes and libels; and the second general principle is that the constitutional guaranty of free speech as a general rule prohibits both the courts and the legislature from putting previous restraints on publications. That there are exceptions to these general principles is recognized, but the plaintiff in bringing its suit for such relief must take upon itself the burden of showing facts which bring it within these exceptions.

The rule long in force was that in the absence of the showing of a violation of some property right, or some breach of trust or of a contract, an injunction was not available to prevent actual or threatened publications of a defamatory character. The question was summarily disposed of in *Gee* v. *Pritchard*, 2 Swanst. 402, in an application for an order to restrain the publication of a libel by the announcement of the court that such act was a crime, and that it had no jurisdiction to prevent it. Likewise, in *Boston Diatite Co.* v. *Florence Mfg. Co.* 114 Mass. 69, the rule was laid down specifically: "The jurisdiction of a court of chancery does not extend to cases of libel, or slander, or of false representations as to the character or quality of the plaintiff's property, or as to his title thereto, which involve no breach of trust or of contract."

Many cases during the early history of the country sustain this principle. In *Francis* v. *Flinn*, 118 U.S. 35, 30 L. ed. 165, an application for an injunction for publishing words amounting to a libel was denied, the court saying: "If the publications in the newspapers are false and injurious, he can prosecute the publishers for libel. If a court of equity could interfere and use its remedy of injunction in such cases, it would draw to itself the greater part of the litigation properly belonging to courts of law." In *Flint* v. *Hutchinson Smoke Burner Co.* 16 L.R.A. 243, (Mo.) it is held that an injunction would not

be issued against a slander of title to a patent by false statements made to plaintiff's prospective customers, because the jurisdiction of a court of equity does not apply to cases of libel or slander, and in such case it is required that the libel or slander be first established by a court of law, the court saying: "We live under a written Constitution which declares that the right of trial by jury shall remain inviolate; and the question of libel or no libel, slander or no slander, is one for a jury to determine. Such was certainly the settled law when the various constitutions of this state were adopted, and it is all-important that the right thus guarded shall not be disturbed. It goes hand in hand with the liberty of the press and free speech."

The same rule has been followed in New York and many other states, and in *Christian Hospital* v. *People ex rel. Murphy,* 223 Ill. 244, the rule is quoted as though it were a maxim of equity. Since the adoption of the fourteenth amendment, requiring the several States to accord due process of law, a large number of the cases, in which injunctions to enjoin libels and defamation would have been denied, have been denied upon the constitutional provisions guaranteeing free speech and free press.

Probably the first authoritative declaration involving this ground is the case of *Patterson* v. *Colorado,* 205 U.S. 454, 51 L. ed. 879. While this case involved a contempt proceeding, intended to embarrass the court in the administration of justice, in discussing the first amendment the court said: "In the first place, the main purpose of such constitutional provisions is 'to prevent all such previous restraints upon publications as had been practiced by other governments,' and they do not prevent the subsequent punishment of such as may be deemed contrary to the public welfare. [Citations.] The preliminary freedom extends as well to the false as to the true; the subsequent punishment may extend as well to the true as to the false. This was the law of criminal libel apart from statute in

most cases, if not all." Since that time the rule has been announced many times.

In *Brandreth* v. *Lance,* 8 Paige, 24, 34 Am. Dec. 368, (a leading case,) the court says: "It is very evident that this court can not assume jurisdiction of the case presented by the complainant's bill, or of any other case of like nature, without infringing upon the liberty of the press, and attempting to exercise a power of preventive justice which, as the legislature has decided, can not safely be intrusted to any tribunal consistently with the principles of a free government." And finally, in *Near* v. *Minnesota,* 283 U.S. 697, 75 L. ed. 1357, it is conclusively established that neither the legislature nor the courts may infringe upon the constitutional guaranty of the liberty of press and of speech. The principles announced in the latter case are so broad and sweeping, and so conclusively settle the proposition that it must be regarded as determinative of the question. It first states: "It is no longer open to doubt that the liberty of the press and of speech is within the liberty safeguarded by the due process clause of the Fourteenth Amendment from invasion by state action." After making an extensive review of the previous law, as well as the points involved in the particular case, the court says: "The liberty deemed to be established was thus described by Blackstone: 'The liberty of the press is indeed essential to the nature of a free state; but this consists in laying no *previous* restraints upon publications, and not in freedom from censure for criminal matter when published. Every freeman has an undoubted right to lay what sentiments he pleases before the public; to forbid this, is to destroy the freedom of the press, but if he publishes what is improper, mischievous or illegal, he must take the consequences of his own temerity.' [Citations.]" The opinion then specifically adopts the language of the *Patterson case* and of the *Brandreth case,* and concludes by holding a statute invalid that authorized injunction pro-

ceedings to suppress it. This case undoubtedly represents the law at the present time, as affecting the general right to enjoin libels or defamatory matters.

Many other decisions are cited from State courts and from the Supreme Court of the United States, to comment upon which would unduly prolong this opinion, but they have been adequately discussed by the Appellate Court in its comprehensive opinion, and need no further comment here. It is pointed out, however, in *Near* v. *Minnesota,* that the right of free speech is not absolute, but is one which may be limited in certain respects. Its abuse may be punished. (*Whitney* v. *California,* 274 U.S. 357, 71 L. ed. 1095.) And thus, the law of criminal libel does not violate the law of constitutional provision. (*Patterson* v. *Colorado,* 205 U.S. 454, 51 L. ed. 879.) Security of the government may require limitation of this right, where words or language used in connection with demands by groups have all the effect of force, (*Gompers* v. *Buck's Stove & Range Co.* 221 U.S. 418, 55 L. ed. 797,) or where the language amounts to sedition tending to overthrow the government. *People* v. *Lloyd,* 304 Ill. 23.

There are other exceptions to the general rule, as for instance where defamation is used as coercion in connection with picketing; or is connected with violence or the injuring of property; and injunction is generally limited to those cases where language, or publications, are used in connection with other activities, which actually affect property rights. We are not aware, however, of any case in which it has been held that as against these two general principles an injunction has been granted. to prevent defamation, consisting of libel or slander. As we suggested above, it is necessary that the plaintiff in this case bring itself within some exception to the general rule.

The constitution of this State, section 4, article II, provides: "Every person may freely speak, write and publish on all subjects, being responsible for the abuse of that

liberty." This provision is broader than that of the constitution of the United States, which merely prohibited Congress from making any law abridging freedom of speech or of the press. It will be noted that the person may speak, write, or publish, being responsible for an abuse. We would infer from this language that it refers to punishment by way of damages or criminal penalties. The language does not adjust itself to preventive relief by way of injunction, but to remedies that may be invoked by the statute. Whether this be true or not it is incumbent upon plaintiff to bring itself within the same recognized exceptions to these two fundamental principles.

We cannot take the time to analyze all of the cases cited by appellant, but among all of them there is not a single case in which the only matter involved was an injunction against a libel, or a defamatory publication. *Vulcan De-tinning Co.* v. *St. Clair,* 315 Ill. 40, *Fenske Bros. Inc.* v. *Upholsterers International Union,* 358 Ill. 239, and *Ellingsen* v. *Milk Wagon Drivers' Union,* 377 Ill. 76, were all cases involving a strike accompanied by picketing, violence, and use of publications having the coercive effect of force. As a matter of fact in the *Vulcan Detinning Co. case* the court recognized the principle we have been discussing, and says: "Equity has no right to act for the sole purpose of preventing the commission of crime or the utterance of a libel unless the act which amounts to a crime or a libel threatens an irreparable injury to property. The right to the preventive aid of equity is based upon the necessity of preventing irreparable damage to property and property rights and of restraining actionable wrongs for which the remedy at law cannot afford proper and adequate redress. * * * Injunction is an extraordinary remedy, and where human liberty is involved the writ should be used with great caution." We might remark in connection with this statement that where constitutional

rights are involved the writ should also be used with great caution.

A number of cases are cited by appellant in support of its theory that a court of equity may properly enjoin libels or defamatory statements. An analysis of these cases discloses that they are based upon considerations different from mere libel and slander. For instance, there are cited a number of cases in which injunctions have been granted to a competitor in the business of the plaintiff, libeling the character of its product, of which *Toledo Computing Scale Co.* v. *Computing Scale Co.* 142 Fed. 919, is an example; or cases in which a competitor through publications misrepresents his product as the product of the plaintiff, as in *Hanover Star Milling Co.* v. *Metcalf,* 240 U.S. 403, 60 L. ed. 713; also, those cases in which injunctions have been granted where the credit of a business, or the character of its officers have been defamed by a competitor, such as *Kenderdine* v. *Rouland,* 260 Ill. App. 194. It is clear that none of these cases have any relevancy to the instant proceeding, because there is no allegation, and necessarily could be none, that the defendant union and union officers were competitors of Wards.

The next line of cases cited by appellant are those in which injunctions have been granted against labor unions making untrue statements against the employer. An example of this type of case is *Magill Bros. Inc.* v. *Building Service Employees International Union,* 20 Cal. 2d 506, 127 Pac. 2d 542. In each of these cases there was a labor dispute in which picketing was carried on, and untruthful publications displayed on signs or placards carried by pickets, which the courts have held amounts to physical or moral coercion. These cases all come within the definition of coercion, and are an exception to the general rule that publications may not be enjoined. For instance, in *Wilner* v. *Bless,* 243 N.Y. 545, 154 N.E. 598, which

State has been rather liberal in the granting of labor injunctions, the court says the distinction is this: "This case does not come within the doctrine that equity will not enjoin the publication of a libel. The acts were wrongfully and continuously done to cause damage to plaintiff by coercive methods. Damage might be difficult of proof, and equity will give relief."

The two lines of cases just mentioned are to be distinguished in that the first constitutes what are known as "trade libels," hereafter discussed, and the latter come within the doctrine of "constructive coercion" or "effect of force words," condemned by the Supreme Court in *Gompers* v. *Buck's Stove & Range Co.* 221 U.S. 418, 55 L. ed. 797, and *Truax* v. *Corrigan,* 257 U.S. 312, 66 L. ed. 254. We might remark here that *Swing* v. *American Federation of Labor,* 372 Ill. 91, relied upon so heavily by appellant, was a case in which force and violence were used in connection with the publication of defamatory matter during the conduct of a strike. The statement made in that case was based upon an assumption that force had been used, and was not intended as a general declaration of principle that repeated libels could be enjoined by a court of equity.

The appellant also relies upon a number of decisions of the Supreme Court of the United States which hold in general that false, continuing libels are not a constitutional prerogative, relieving the publisher of damages or penalties, but none of these cases hold that a mere libelous matter may be previously enjoined. *Cafeteria Employees Union* v. *Angelos,* 320 U.S. 293, 88 L. ed. 58, *Bakery & Pastry Drivers* v. *Wohl,* 315 U.S. 769, 86 L. ed. 1178, and *Carlson* v. *California,* 310 U.S. 106, 84 L. ed. 1104, are cases involving labor disputes and the use of false statements in connection with picketing, boycotting, violence and the like, and none of them discuss the question involved here, but all confirm the constitutional right of

free press and free speech, with the limitations pointed out above. *Chaplinsky* v. *New Hampshire,* 315 U.S. 568, 86 L. ed. 1031, and *Thornhill* v. *Alabama,* 310 U.S. 88, 84 L. ed. 1093, involve criminal prosecutions of members of a religious sect, and are not relevant. In fact, we have examined every case cited by appellant, and have not found one which bears directly upon the point in controversy.

The application of these last cited decisions of the United States Supreme Court is properly analyzed by the opinion of the Appellate Court, and need not be further discussed. The cases more nearly applying to the appellant's contention are those wherein trade libels were involved. *Black & Yates, Inc.* v. *Mahogany Ass'n, Inc.* 129 Fed. 2d 227, points out clearly, in a most adequate manner, the distinction between the enjoining of a personal libel and of a trade libel. Most of these cases involving trade libels originated after the creation of the Federal Trade Commission, and the prohibitions against unfair competition then enacted. In the *Black & Yates case,* in making the distinction, the court said: "But the phrase 'pure trade libel' has been called a misnomer which has resulted in ascribing to this tort the legal attributes of libel and slander, particularly the inherent characteristics of defamation, and in the consequent application of the dogma that a court of equity will not enjoin a continuing libel or slander. There is a clear line of demarcation between the two torts which is often overlooked. The first is concerned with interests of personality, the other with interests of property. Thus, the Restatement classifies libel and slander as 'Defamation,' 'Invasions of Interest in Reputation,' and trade libels as 'Disparagement,' 'Invasions of Interests in the Vendibility of Property by Disparagement.' A judicial consciousness of this distinction and the consequent attendant difference in legal incidents would avoid the 'confusion' 'it (trade Libel) has led to' and 'The application of false analogies.' Or more specifically the failure

to realize that the action for disparagement of property has a place of its own in the law; and is not a mere branch, or special variety, of the action of defamation of personal reputation or of the action for deceit."

The distinction between defamation and disparagement is recognized in the Restatement of Torts, vol. 3, p. 323, and 33 Am. Juris. p. 371. Generally where the words relate to the person of the plaintiff or to his business the cause of action is the ordinary one of defamation and is subject to the rules applicable thereto. (*Victor Safe & Lock Co.* v. *Dwight,* 211 Fed. 211; Am. Anno. Cases 1914-D, 841; *Black & Yates, Inc.* v. *Mahogany Ass'n, Inc.* 129 Fed. 2d. 227, 148 A.L.R. p. 841.) This distinction disposes of the cases cited by appellant relating to trade libels, for the publications in the present case, if anything, are libels. It seems to us that with this distinction in mind, unless there is something in appellant's complaint that brings its action within trade disparagement the plaintiff has failed to establish a cause of action.

The contention made in its brief as to the defamatory character of the various publications may be subdivided substantially as follows: (1) statements in which it is claimed Wards is charged with a violation of the State or Federal law, a fair example of which is the following: "Department heads and even the personnel department have brazenly quizzed workers about their union affiliations, which is a complete violation of workers' rights and the law of the land;" (2) statements, which Wards claims, describe the maintenance of unsanitary working conditions —"Many girls have broken down and given way to hysterics right on the job;" another, "One man in my department swallowed a pin and was fired without being given medical aid;" (3) published statements, which Wards claims describes the lack of good morals in its supervisory employees: "Give him a brown shirt, a Swastika, and a sawed-off shotgun—and you have in supervisor Stanley

Stiglick the perfect concentration camp Storm Trooper;" (4) publications which Wards claims charges management with despising the government of the United States, and the republication in six different localities of an item appearing in the Chicago *Spotlight;* the apparent purpose of this being to establish conspiracy by the reprinting of an article published by one union paper in another.

We have not attempted to set out the specific articles, some of which, if accompanied by the proper innuendoes, would probably be libelous, but to describe each and every pamphlet publication, some four hundred in number, would serve no good purpose. It is apparent, however, that the description of unsanitary working conditions, or of the alleged lack of morals of its supervisors as set forth would require something more than the mere words used to make them even defamatory. There is no connection between such statements and business damage, nor any allegation of picketing, violence, coercion, or a strike being conducted. The gist of the complaint is the publication of pamphlets and papers, considered by Wards as a libel upon its officers or supervisors or department heads, and therefore a libel upon Wards. The citation of cases involving only trade disputes does not support the proposition that opprobrious or scurrilous epithets concerning an employer, or the supervising officials of the employer, constitute a trade libel, which in its essence requires some statement of a competitor or business rival; which will take away business and give it to another.

We have shown that the commission of a libel or defamatory publication previous to its issuance may not be enjoined, so the question remains whether a conspiracy to libel only may be restrained by injunction before its utterance. Since one person may not be previously restrained by injunction from uttering defamatory matter, may what one may do alone subject the same action to injunction if done by two or more, is a debated question.

The contention of the plaintiff, however, is that the motion to dismiss confesses all of the matters well pleaded in the complaint. As we pointed out above, the complaint shows that all of the defendants, the international labor union, the subordinate unions, and their officers and members are in effect one body, although separated for local convenience. Unions are not *per se* a conspiracy. (*Wilson* v. *Hey*, 232 Ill. 389; *Carpenters' Union* v. *Citizens Committee*, 333 Ill. 225.) The courts have many times held that working men have the right to combine and organize for the purpose of improving their conditions. They may, in order to compel their employers to accede to their demands, quit the service singly or in a body, and may, if while peaceably picketing, carry banners and other placards or written matter, even though it may be defamatory. The important thing is that there be no violence, coercion, intimidation, or other acts that have the effect of force. There is a grave question in this case whether an unlawful conspiracy has been charged. The gist of civil conspiracy is damage, not the combination. (*Pustelniak* v. *Vilimas*, 352 Ill. 270; 11 Am. Juris. 577.) And it has been said by inference that it is the person libeled who must file the complaint. *Vulcan Detinning Co.* v. *St. Clair*, 315 Ill. 40.

There is no claim in this case that any criminal indictments or informations have been sought, or tried, or that any damage suits have been instituted or recoveries had by either the plaintiff or any of·the officers or supervisors who were criticized. In the instant case no strike is involved. Amongst the number of publications included in the record are many which are not libelous; many that would not be considered defamatory unless made under the proper innuendoes; and many that are libelous *per se,* but boiled down to its ultimate the complaint shows the plaintiff desires to enjoin the issuance of publications which reflect upon its officers and other personnel, and which will

thus affect some of its 650 stores. We have yet to find a case which holds a labor union may be enjoined from defamatory statements concerning the employer, or the officers, where no actual damage to the business, other than the loss of reputation of individuals, is shown to exist.

In *Kemp* v. *Division No. 241,* 255 Ill. 213, an injunction had been issued restraining the union from conspiring to procure the discharge of plaintiff's other employees, because they did not belong to the union. Holding that it had the right to procure such discharge, if possible, as a legitimate industrial weapon, the court held irreparable injury was not established, because if the union had the right to so act it was *damnum absque injuria,* or, as Judge Cooley says, in his classic work on Torts, "that the exercise by one man of his legal right cannot be a legal wrong to another." Under this authority irreparable injury has been insufficiently alleged.

We have purposely refrained from discussing a matter urged at great length in the briefs of both parties, *viz.,* the claim that a labor dispute is involved. The defendants were charged only with personal acts as members of a union, whose members were employed by Wards, and who were publishing scurrilous and opprobrious language concerning the plaintiff's officers and department heads, from which plaintiff draws certain conclusions of conspiracy and damages. We are not at all satisfied that the conclusions to be inferred are such as claimed by the plaintiff, but whether that be true or not, there is no question of wages, working conditions, contracts, or any other disputed matter between the members of the unions and the management, exercising control over the several stores of Wards. It requires something more than a verbal or written abuse, or criticism of an employer, to make a labor dispute, when so far as the record shows, they are still working without interruption.

The implications contained in this proceeding are broad.

The writ of injunction for restraining publications must be used in exceptional cases only. And it would indeed be exceptional to enjoin all of the employees of some 650 stores, located from New York to Colorado, from making disparaging publications concerning their managing officers merely because they all belonged to the parent, or subordinate unions. To enjoin words or acts which would cause fear, hate, or distrust, is so general that the employer would become the censor of his employees' publications, because of their union membership. The employee is deprived of a jury trial, the many made to suffer for the acts of a few, and punishment for violation may be sought for those in other jurisdictions than that of the court issuing the order. Strong reasons must be shown for such a drastic remedy. It appears from the pleadings that the management is located in Chicago, and we fail to perceive how the dislike of an employee in Denver will affect the business in Chicago, or how it will affect even the business in Denver. It requires something more urgent than general charges to authorize such a sweeping type of injunction, so apt to infringe constitutional guaranties.

We have not undertaken to discuss all of the questions raised by the parties, but have endeavored to determine whether the members of a union, not on a strike, not picketing, and not using coercion in any way, may, as a union and as union members, be enjoined from exercising rights guaranteed by the constitution of the United States and of this State, in a proceeding contrary to the definite practice in equity for more than one hundred years.

We are satisfied that the plaintiff has failed to bring itself within that class of cases where injunctive relief is permissible, and the judgment of the Appellate Court for the First District reversing the superior court of Cook County, with directions to dismiss the complaint for want of equity, is hereby affirmed.      *Judgment affirmed.*