176 So.2d 922 (1965)
George A. MURPHY, individually, and as Chairman of Taxpayers Dogwatch Committee, Appellant,
v.
DAYTONA BEACH HUMANE SOCIETY, INC., a non-profit corporation, Appellee.
No. G-256.
District Court of Appeal of Florida. First District.
June 29, 1965.
*923 Anthony J. Grezik, Daytona Beach, for appellant.
Thomas A. Koehler, Daytona Beach, for appellee.
RAWLS, Judge.
This is an interlocutory appeal by George A. Murphy from a temporary restraining order.
Daytona Beach Humane Society, Inc., a nonprofit corporation, filed its complaint against Murphy, individually and as Chairman of Taxpayers Dogwatch Committee, alleging that Murphy is attempting to hamper the operations of the society by approaching Society members and public officials and by certain correspondence and publications which falsely attack the management and officers of the Society and create the impression that the plaintiff organization is misusing municipal tax funds paid to the organization for certain services. It is alleged that all of these activities will cause irreparable harm by discouraging membership in the Society and by hampering its drive for contributions to the Society's building fund for the construction of a new animal shelter and administrative office on a parcel of land recently acquired from Volusia County. Attached to and made a part of the complaint are several letters and publications. The Society contends that the substance of these documents is that Murphy has charged the Society with mismanagement of its funds (52% of which are derived from taxes), with undemocratic and unbusinesslike manner of operation, and with control in the hands of officers who are benefitting, directly or indirectly, from Society funds. Since we must view the pleading in the light most favorable to the Appellee, we accept its view of these publications for the purposes of this appeal.
The chancellor's temporary restraining order reflects that hearing was held on February 16, 1965, that the case "is a proper cause for the granting of a temporary restraining order" and that the defendants "are hereby enjoined and restrained from the publishing of any further newspaper publications, correspondence or the circulation of further printed material attacking the management and character of the Officers and Directors of the Plaintiff corporation."
The sole question presented by this interlocutory appeal is whether the chancellor erred in finding that this is a proper cause in which he may exercise his discretion in issuing the temporary injunction.
The arguments of the appellant are the same as those advanced many times during the past century for similar cases in numerous jurisdictions. He contends that the temporary injunction is a denial of his freedom of speech and press; that the seeking of an injunction does not confer equitable jurisdiction; that equity will not assume jurisdictions where there is an adequate remedy at law; and that according to the weight of authority and law of this State, equity will not enjoin the commission of a threatened libel or slander.
We would be remiss if we did not note at the outset that the essence of this complaint is that a former member, now expelled, has charged mismanagement of the funds of a nonprofit organization which derives its moneys from membership fees, public solicitations and tax funds. The complaint does not allege malice. It does allege that some of the statements in the attached publications are untrue but does not designate which statements. The attached documents do show concern for what they term the "fiscal irresponsibility of the Society" in its use of tax funds. Matters of public interest are generally considered legitimate subjects of criticism, however severe, unless made maliciously. Private corporations which claim the confidence of the public and seek the possession of *924 public funds are among the subjects that may be criticised in accordance with the rules of fair comment, and it has even been said that bona fide criticism of such corporations should be encouraged as a means of public security, rather than suppressed.[1] However, this is not an action at law to recover damages for libel, and the subject matter of the alleged libel is not decisive of the issue here, not only because the parties failed to argue the point but also because the outcome of this appeal is squarely controlled by another rule of law.
Although courts of chancery may enjoin other types of wrongful acts, the general rule is that they cannot restrain an alleged libel or slander in the absence of some other independent ground for the invocation of equitable jurisdiction regardless of whether the defamation is personal or relates to one's property. The reason for the rule is threefold. 1. There is an adequate legal remedy, either by an action for damages or by criminal prosecution. 2. Equity jurisdiction is traditionally limited to the protection of property rights. 3. Injunctive relief inhibits the constitutional guarantees of freedom of speech and press and the right to trial by jury on the question of truth or falsity of the alleged libel.[2]
This rule has its origin in the infamous English Star Chamber which exercised, until its abolition, the power of cutting off ears, branding the foreheads and slitting the noses of the libellers of important persons. As an incident to this jurisdiction it also issued injunctions to restrain the publication of libels. The author of Brandreth v. Lance[3] stated,
"Since that court [Star Chamber] was abolished, however, I believe there is but one case upon record in which any court, either in this country or in England, has attempted, by an injunction or order of the court, to prohibit or restrain the publication of a libel, as such, in anticipation. In the case to which I allude, the notorious Scroggs, chief justice of the court of king's bench, and his associates, decided that they might be safely entrusted with the power of prohibiting and suppressing such publications as they might deem to be libellous. They accordingly made an order of the court prohibiting any person from printing or publishing a periodical, entitled `The Weekly Packet of Advice from Rome, or the History of Popery.' The house of commons, however, considered this extraordinary exercise of power on the part of Scroggs as a proper subject of impeachment. (8 Howell's State Trials, 198.) And I believe no judge or chancellor from that time to the present, has attempted to follow that precedent."
After the adoption of the Common Law Procedure Act of 1854 and the Judicature Act of 1873, English courts were given statutory jurisdiction to enjoin defamatory publications in proper cases, but both the English and Canadian courts have been extremely reluctant to exercise that power, except in the case of a trade libel, since it interfered with the right of free speech.[4]
There is no necessity to delve into the profession of American cases[5] dealing with the effect the American constitutional *925 guarantees have upon this question, for the general rule was adopted in 1895 in Florida. In Reyes v. Middleton[6] the defendants distributed and posted in public places in St. Augustine printed and written circulars stating that they own a one-half interest in plaintiffs' land, warning persons against buying said lands and offering to sell the same themselves. The Florida Supreme Court in reversing the chancellor's decree and dismissing the bill of complaint stated the rule thusly:
"It seems to be well settled that a court of equity will never lend its aid, by injunction, to restrain the libeling or slandering of title to property, where there is no breach of trust or contract involved, but that in such cases the remedy, if any, is at law, and that the alleged insolvency of the libelant, in such cases, will not, of itself, authorize the interference of the court of equity."
The rule was again followed in Moore v. City Dry Cleaners & Laundry and restated in these words:[7]
"Section 13 of the Declaration of Rights, Constitution of Florida, declares that `every person may fully speak and write his sentiments on all subjects being responsible for the abuse of that right * * *.' In the absence of an express situation plainly requiring reasonable public regulation in the interest of human life and safety, the right may not be denied or abridged. * * * The fact that statements made under such circumstances may prove, after publication, to be in fact untruthful will not create an exception to the rule stated. Where, as in this State, a party is amenable to suit * * and such party is made accountable under the fundamental law for an abuse of the right of free expression, a court of equity will not enjoin the commission of a threatened libel or slander; for the imposition of judicial restraints in such a case would clearly amount to prior censorship, a basic evil denounced by both the Federal and State constitutions. An action at law will ordinarily provide a full, adequate and complete remedy in such cases; particularly where no breach of trust or contract appears, or where no continuing irreparable injury not compensable in a court of law is shown." (Emphasis supplied.)
In the Moore case the Supreme Court affirmed those portions of the chancellor's decree which enjoined the acts of picketing the laundry and molesting, interfering, intimidating, coercing or directing violence toward the laundry, its property and employees. However, it reversed that portion of the decree which enjoined the union from using public information media to bring their cause to the forum of public opinion.
We conclude that the complaint in the instant cause states no grounds upon which equitable relief can be granted. Furthermore, we are not here concerned with the situation of one interfering with another's business, which has, on occasions, been recognized as an exception to the general rule. The Humane Society does not have any property right, as such, in its activity of soliciting funds from the public in the sense that an individual has a property right in his business, so the principles of law pertaining to unlawful interference with one in the conduct of his business and *926 the enjoyment of a good name and public good will of such business are not applicable here.[8]
The appellee Society contends that the appellant's motion to dismiss was not considered by the chancellor at the time the order appealed was entered because the motion was filed and served on February 8, 1965 only one day before the noticed hearing, and therefore, a determination of whether the complaint states a cause of action is premature. The order appealed conclusively shows that the hearing was held on February 16, 1965, and it further shows that the chancellor found that this is a proper cause for the granting of a temporary restraining order. Whether the chancellor considered the motion or not is immaterial, for he did make a decision upon whether this was a proper cause for invoking injunctive relief. As early as 1906 the Florida Supreme Court said that it was already "well settled" that no restraining order or temporary injunction should be granted on a "bill" in chancery which clearly states no cause for equitable relief.[9] The nature of a temporary injunction is such that it is granted sparingly and cautiously, taking into consideration the beneficial results on one hand and the probable detriment on the other.[10] Furthermore, where the complaint shows upon its face that there exists an adequate remedy at law, there is no jurisdiction in a court of equity.[11]
The complaint here alleged only slander and libel for which there is a complete and adequate remedy at law. There is a total absence of any allegation of any other overt act of wrongdoing by which the plaintiff could invoke equity jurisdiction. The complaint having wholly failed to state a cause which is cognizable in equity, the chancellor erred in entering the temporary restraining order.
The order appealed is quashed with directions that the cause be dismissed.
STURGIS, C.J., and WIGGINTON, J., concur specially.
WIGGINTON, Judge (specially concurring).
The rule of law which guides and controls the holding set forth in the majority opinion was spawned in the ancient days of equity jurisprudence in England following abolition of the practice of administering justice by Star Chamber proceedings. That rule of law reflected the popular concept of the day that property rights were of paramount importance, and human or civil rights were relegated to a position of secondary importance in the law. Because of this concept, courts of equity enjoined the making of false and damaging statements by one individual against another only when property rights of the slandered person were adversely affected thereby. It will be noted that every authority cited in the majority opinion emerged before the turn of the twentieth century, save one decision rendered by the Supreme Court of Florida as hereinafter mentioned. It is only because of the adherence by the Supreme Court of *927 Florida to the archaic rule of chancery jurisprudence reflected in the case of Moore v. City Dry Cleaners & Laundry, (Fla. 1949) 41 So.2d 865, that I feel bound to concur in the conclusion reached by the majority opinion.
During the past fifty years original concepts of legal rights, both property and personal, have undergone an evolutionary change in the legal philosophies adopted by courts of final appellate jurisdiction in the United States. The current concept of the proper function of the law is to treat human and civil rights co-equal with property rights. As said by the text writer in American Jurisprudence:
"Historically, equity was concerned with the protection of property rights, and on this ground equity courts have refused to take jurisdiction to grant injunctive relief to protect personal rights. However, the jurisdiction of equity to protect personal rights is now generally recognized, either expressly, or impliedly, and injunction will issue if the right in question is one which has been recognized as entitled to protection or to redress from interference, and if the usual conditions for granting injunctive relief are present. Personal rights of citizens are more sacred and, by every test, of more value than things that may be measured by a purely monetary standard, and the courts have expressed difficulty in understanding why injunctive protection of the one class of rights should be placed above similar protection of the other." 28 Am.Jur. 574-575, Injunctions, § 76.
Although the constitutional guarantees of free speech and free press must be recognized and preserved, such guarantees should not be so highly regarded as to permit a disgruntled former member of an organization to make daily bombardments of false and damaging statements against the organization from which he was expelled, its officers and members, merely for the purpose of satisfying his personal animosities and gratifying his personal piques. It is no answer to the problem to say that injunction should be denied because the injured party or parties have an adequate remedy at law for recovery of damages suffered if the statements complained of are false and unprivileged. While it is true that monetary damages suffered by one as the result of libelous or slanderous statements of another may theoretically be recovered in an action at law against the offending party, such recovery will not necessarily have the effect of deterring the offending party from continuing his slanderous attacks upon the injured party, or prevent continued personal embarrassment, impairment of health, reputation, and ability to carry on one's business in a normal manner, which such conduct necessarily inflicts upon the injured person. For these reasons I disagree with the principle of law on which the majority opinion is based, but feel compelled to concur in the decision merely because it conforms to the rule heretofore promulgated by the Supreme Court of this state.
STURGIS, C.J., concurs.
NOTES
[1] 33 Am.Jur., Libel and Slander §§ 161 and 163 and 20 Fla.Jur., Libel and Slander § 75 and cases cited therein.
[2] 28 Am.Jur., Injunctions § 132; 17 Fla. Jur., Injunctions § 40; 47 A.L.R.2d 715 and cases cited therein.
[3] Brandreth v. Lance, 8 Paige 24, 26 (N.Y. 1839).
[4] Bonnard v. Perryman, 2 Ch 269-CA (Eng. 1891); Lee v. Gibbings, 67 LTNS 263, Times L 773 (Eng. 1892); and Armstrong v. Armit, 2 Times L 887-Div.Ct. (Eng. 1886).
[5] Of particular interest are: New York Juvenile Guardian Society v. Roosevelt, 7 Daly 188 (N.Y. 1877) wherein the plaintiff, a charitable organization, attempted without success to enjoin Theodore Roosevelt and other members of the New York State Board of Charities from publishing certain proceedings involving their examination and inspection of the affairs of the plaintiff society. Mitchell v. Grand Lodge, Free & Accepted Masons, 56 Tex.Civ.App. 306, 121 S.W. 178, 179 (Texas App. 1909) wherein it was alleged that defendant's publications caused loss of membership to the fraternity and greatly injured it financially, but it was held that equity was without jurisdiction to issue an injunction.
[6] Reyes v. Middleton, 36 Fla. 99, 17 So. 937, 939, 29 L.R.A. 66, 51 Am.St.Rep. 17 (1895).
[7] Moore v. City Dry Cleaner & Laundry, 41 So.2d 865, 873 (Fla. 1949).
[8] See Upton House Cooler Corp. v. Alldritt, 73 So.2d 848 (Fla. 1954) which recognizes that trade libels are remediable through actions at law. Montgomery Ward & Co. v. United Retail, Wholesale & Department Store Employees of America, C.I.O., 400 Ill. 38, 79 N.E.2d 46 (1948) which defines "trade libels" and discusses that class of cases where a competitor may be enjoined from unlawful interference with another's business. One such case was Florida Ventilated Awning Co. v. Dickson, 67 So.2d 215 (Fla. 1953) wherein injunction was granted against the defendant, a competitor, who was found guilty of unfair competition and infringement on the franchise of the plaintiffs. See also 148 A.L.R. 853, Trade Libels, and cases cited therein.
[9] Hall v. Horne, 52 Fla. 510, 42 So. 383 (Fla. 1906).
[10] Stirling Music Co. v. Feilbach, 100 So.2d 75 (Fla.App.3d, 1958).
[11] Greenfield Villages v. Thompson, 44 So.2d 679 (Fla. 1950).